**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT JAY MAXWELL,<br><br>                    Petitioner,<br><br><br><br><br><br>                    vs.<br><br>MATTHEW CATE, Secretary, et al.,<br><br>                    Respondents. | Civil No.   10cv1697-MMA (RBB)<br><br><br>**REPORT AND RECOMMENDATION RE:**<br>**DENIAL OF PETITION FOR WRIT OF**<br>**HABEAS CORPUS   [ECF NO. 1]** |

**I.    INTRODUCTION**

Robert Jay Maxwell (hereinafter "Maxwell" or "Petitioner"), is a state prisoner proceeding by and through counsel with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 [ECF No. 1].  Maxwell challenges his San Diego County Superior Court convictions for first degree robbery, assault with a semiautomatic handgun, assault with a semiautomatic rifle, residential burglary, false imprisonment by violence or menace, grand theft of personal property, intimidating a witness by force or threat, and five counts of tampering with electric, telephone and cable television

1    lines.  (See Pet. 2-4, ECF No. 1; see also Lodgment No. 1, Clerk's

2    Tr. vol. 1, 0179-86, Jan. 31, 2006 (consolidated amended

3    information); id. vol. 4, 0685-96, Feb. 14, 2006 (verdicts).)

4    Petitioner contends his federal constitutional rights under the

5    Fifth, Sixth and Fourteenth Amendments were violated due to

6    repeated incidents of prosecutorial misconduct, ineffective

7    assistance of trial and appellate counsel, and the cumulative

8    effect of those errors.  (See Pet. 5-7, ECF No. 1; id. Mem. P. & A.

9    Supp. Pet. 14-39.)

10        Respondent Matthew Cate (hereinafter "Respondent"), answers

11   that habeas relief is not available because the prosecutorial

12   misconduct claims are procedurally defaulted due to trial counsel's

13   failure to contemporaneously object to the alleged misconduct or

14   request curative jury instructions.  (See Answer Attach. #1 Mem. P.

15   & A. 20-21, ECF No. 7.)  Respondent also argues that habeas relief

16   is unavailable because the adjudication of Petitioner's claims by

17   the state appellate court was neither contrary to, nor an

18   unreasonable application of, clearly established federal law, and

19   was not based on an unreasonable determination of the facts.  (Id.

20   at 21-49.)

21        Based upon a review of the pleadings and documents presented

22   in this case, and for the reasons set forth below, the Court

23   **RECOMMENDS** the Petition be **DENIED**.

24   II.   PROCEDURAL BACKGROUND

25        On January 31, 2006, a thirteen-count consolidated amended

26   information was filed in the San Diego County Superior Court

27   charging Petitioner and two other individuals, Michael James Murphy

28   and Thomas Tyson Zingsheim, with first-degree robbery in violation

of California Penal Code ("Penal Code") sections 211 and 212.5(a)
(count one); assault with a semiautomatic handgun in violation of
Penal Code section 245(b) (count two); assault with a semiautomatic
rifle in violation of Penal Code section 245(b) (count three);
residential burglary of an inhabited dwelling in violation of Penal
Code sections 459 and 460 (count four); false imprisonment by
violence, menace, fraud, or deceit in violation of Penal Code
sections 236 and 237(a) (count five); grand theft of personal
property in violation of Penal Code section 487(a) (count six);
dissuading a witness by force or threat in violation of Penal Code
section 136.1(c)(1) (count seven); and five counts of tampering
with electric, telephone, and cable television lines in violation
of Penal Code section 591 (counts eight through twelve). (Lodgment
No. 1, Clerk's Tr. vol. 1, 0179-86 (consolidated amended
information).) The charging document alleged that on January 29,
2005, Maxwell personally used a firearm during the commission of
counts one through six, was vicariously armed during count seven,
and had a prior serious felony conviction within the meaning of
Penal Code sections 667(a)(1), 668 and 1192.7(c), which constituted
a "strike" within the meaning of Penal Code sections 667(b)-(i),
668 and 1170.12, California's three-strikes law.[1] (Id. at 0182-
87.)

Following a jury trial, Maxwell was convicted on all twelve
counts. (Lodgment No. 1, Clerk's Tr. vol. 4, 0685-96 (verdicts).)

---

[1] Codefendant Zingsheim was also charged with a second count of
residential burglary in violation of Penal Code section 459 (count
thirteen). (Id. at 0186.) Two other individuals, Tuesdae Ditmars and
Evan Baltsas, were charged in an earlier version of the information but
pleaded guilty prior to trial. (Lodgment No. 1, Clerk's Tr. vol. 1,
0016-24, May 19, 2005 (amended information); Lodgment No. 22, People v.
Zingsheim, No. D049189, slip op. at 1 (Cal. Ct. App. July 10, 2008).)

The jury found that Petitioner had personally used a firearm during the commission of counts one through six, and was vicariously liable for an armed principal during the commission of count seven, within the meaning of Penal Code sections 12022(a)(1) & 12022.5(a). (Id. at 0685-91.) Petitioner's codefendants were also convicted on all charges, with the exception of count eight (disabling an alarm system), for which Maxwell alone was found guilty. (Lodgment No. 4, Rep.'s Tr. vol. 14, 2521-32, Feb. 15, 2006.)

Maxwell admitted the prior conviction allegation. (Id. at 2546.) The court struck the prior "strike" conviction so as to prevent a mandated punishment under the three strikes law, and sentenced Petitioner to a term of twenty-one years in state prison, which included a six-year term on count one, concurrent or stayed terms on the remaining counts, a ten-year enhancement for the firearm use findings, and a five-year enhancement for his prior conviction. (Id. Rep.'s Tr. vol. 14, 2558-61, July 18, 2006; Lodgment No. 1, Clerk's Tr. vol. 4, 0851, July 18, 2006 (mins).)

Petitioner filed an appeal in the California Court of Appeal for the Fourth Appellate District, Division One, in which he raised, among other issues, the prosecutorial misconduct claims presented as claim one here. (Lodgment No. 13, Appellant's Opening Brief, People v. Maxwell, No. D049189, slip op. (Cal. Ct. App. July 10, 2008.) While the appeal was pending, Maxwell filed a habeas petition in the appellate court arguing that the five-year enhancement for his prior felony conviction should be struck because the conviction had been reduced to a misdemeanor before trial. (Lodgment No. 16, In re Maxwell, No. D051961 (Cal. Ct. App. filed Nov. 9, 2007) (petition).) The state appellate court

-4-

consolidated Petitioner's appeal with that of his codefendants, and affirmed the convictions in all respects in an unpublished opinion. (Lodgment No. 22, People v. Zingsheim, No. D049189, slip op. at 75.) As discussed in detail below, the appellate court reached the merits of the prosecutorial misconduct claims after first finding they had been waived or forfeited due to a failure to properly object or request curative instructions. (Id. at 32-39, 44-45, 48-59.) With respect to Petitioner's sentence, the appellate court stuck the true finding regarding Petitioner's prior conviction and remanded for a new sentencing hearing. (Id. at 75.) On the same day, the appellate court denied Maxwell's habeas petition as moot in light of the relief provided on direct appeal. (Lodgment No. 23, In re Maxwell, No. D051961, order (Cal. Ct. App. July 10, 2008).)

Petitioner thereafter filed a petition for review in the California Supreme Court in which he presented the prosecutorial misconduct claims raised here. (Lodgment No. 24, Petition for Review, People v. Maxwell, No. SD2006802244 (Cal. filed Aug. 18, 2008).) The court consolidated that petition with the petitions for review filed by Maxwell's codefendants, and denied them all in a single order without a citation of authority or a statement of reasoning. (Lodgment No. 25, People v. Zingsheim, No. S165976, order (Cal. Oct. 20, 2008).)

Maxwell was subsequently resentenced to a term of nineteen years and four months in state prison. (Lodgment No. 28, Rep.'s Tr. vol. 1, 9-13, Feb. 25, 2009.) He thereafter filed an appeal of the resentencing which raised issues not relevant to this proceeding. (Lodgment No. 29, Appellant's Opening Brief, People v.

<u>Maxwell</u>, No. D054785, slip op. (Cal. App. Ct. Jan. 26, 2010).)
Petitioner filed a second appellate court habeas petition, which
included a request to consolidate it with the pending appeal, in
which he alleged, as he does in claim two here, that to the extent
his prosecutorial misconduct claims were forfeited due to the
failure to properly object at trial or request curative jury
instructions, relief was still available under a theory of
ineffective assistance of counsel.  (Lodgment No. 30, <u>In re</u>
<u>Maxwell</u>, No. D055492 (Cal. Ct. App. filed July 15, 2009) (pet.).)
Although the appellate court initially stated that it would
consolidate the habeas petition and appeal, it later vacated that
order and denied the habeas petition without prejudice to filing in
the superior court.  (Lodgment No. 33, <u>In re Maxwell</u>, No. D055492,
order (Cal. Ct. App. Dec. 2, 2009).)  The appellate court affirmed
Petitioner's new sentence.[2]  (Lodgment No. 35, <u>People v. Maxwell</u>,
No. D054785, slip op. (Cal. App. Ct. Jan. 26, 2010).)

Maxwell filed a habeas petition in the superior court raising
the ineffective assistance of counsel claims and the cumulative
error claim presented here as claim two.  (Lodgment No. 34, <u>In re</u>
<u>Maxwell</u>, No. HSC11113 (Cal. Sup. Ct. filed Jan. 25, 2010)
(petition).)  The superior court denied the petition on the basis
that Petitioner had failed to make a prima facie showing for relief
as to any claim.  (Lodgment No. 37, <u>In re Maxwell</u>, No. HSC11113,
order (Cal. Sup. Ct. Mar. 16, 2010).)

---

[2] Maxwell filed a petition for review of the resentencing order in
the California Supreme Court which did not include claims relevant to
this federal proceeding.  (Lodgment No. 36, Petition for Review, <u>People</u>
<u>v. Maxwell</u>, No. SD2009701780 (Cal. filed Mar. 5, 2010).)  That petition
was denied without citation of authority or a statement of reasoning.
(Lodgment No. 39, <u>People v. Maxwell</u>, No. S180700, order (Cal. Apr. 14,
2010).)

Maxwell thereafter filed a habeas petition in the appellate court presenting the same claims raised in the superior court petition.  (Lodgment No. 38, In re Maxwell, No. D057039 (Cal. Ct. App. Mar. 26, 2010) (petition).)  The appellate court denied the petition on the grounds that the court had already found there was no reversible or cumulative error arising from the alleged instances of prosecutorial misconduct upon which the ineffective assistance of counsel and cumulative error claims were based. (Lodgment No. 41, In re Maxwell, No. D057039, order (Cal. App. Ct. Apr. 30, 2010).)

Petitioner presented those same claims in a petition for review filed in the California Supreme Court.  (Lodgment No. 42, Petition for Review, In re Maxwell, No. [S182412] (Cal. filed May 5, 2010).)  That petition was denied without citation of authority or a statement of reasoning.  (Lodgment No. 43, In re Maxwell, No. S182412, order (Cal. July 14, 2010).)

Maxwell, proceeding through counsel, filed a habeas corpus Petition pursuant to 28 U.S.C. § 2254 in this Court on August 12, 2010, with an attached Memorandum of Points and Authorities in Support thereof [ECF No. 1].  Respondent filed an Answer to the Petition on November 15, 2010, along with a Memorandum of Points and Authorities in Support of the Answer [ECF No. 7].  Petitioner filed a Traverse on December 7, 2010, along with a Memorandum of Points and Authorities in Support thereof [ECF No. 11].

## III.  **TRIAL PROCEEDINGS**

Petitioner was jointly tried with codefendants Michael Murphy and Thomas Zingsheim.  All three were accused of crimes stemming from a home invasion robbery at the residence of Ryan Guerrero;

1  Tuesdae Ditmars and Evan Baltsas, both of whom pleaded guilty
2  before trial, were also involved.  In addition, Murphy and
3  Zingsheim were charged with another burglary that did not involve
4  Petitioner.

5      Tuesdae Ditmars, the first witness called, testified that she
6  had been continuously in custody since her arrest in this case.
7  (Lodgment No. 4, Rep.'s Tr. vol. 1, 109-10, Jan. 25, 2006.)  She
8  was arrested several minutes after the Guerrero robbery while
9  riding in a car driven by Zingsheim and in possession of property
10  taken from the Guerrero residence.  (<u>Id.</u>)  Ditmars was convicted,
11  pursuant to a guilty plea, of robbery at the Guerrero residence and
12  residential burglary of the Leombrone residence.  (<u>Id.</u> at 92;
13  Lodgment No. 1, Clerk's Tr. vol. 4, 729, May 16, 2006 (probation
14  officer's report).)  Ditmars testified that she had no deal with
15  the prosecution regarding her testimony; she had wanted to invoke
16  her Fifth Amendment right and not testify but was told by her
17  attorney that she was not allowed to do so.  (Lodgment No. 4,
18  Rep.'s Tr. vol. 1, 122; <u>id.</u> Rep.'s Tr. vol. 3, 534, Jan. 26, 2006.)
19  As part of her guilty plea, she admitted that she had been
20  vicariously armed at both residences and that Petitioner and Murphy
21  had been armed during the Guerrero robbery.[3]  (<u>Id.</u> Rep.'s Tr. vol.
22  1, 92-93, 121.)

23      Due to Ditmars's stated inability to remember clearly the
24  events of the Guerrero robbery, the prosecutor, only a few minutes

25  ───────────────
26      [3]  Ditmars was sentenced to three years in prison.  (Lodgment
    No. 1, Clerk's Tr. vol. 4, 729 (probation officer's report).)
27  Although that fact was not presented to the jury, two jurors
    admitted reading a newspaper article which reported Ditmars's
28  sentence.  (Lodgment No. 4, Rep.'s Tr. vol. 12, 2200-07, Feb. 9,
    2006.)

10cv1697

into her testimony, asked her about statements she had made to a probation officer in connection with her sentencing. (Id. at 96-97.) The prosecutor had placed brief excerpts of the probation officer's report on defense counsels' table before counsel arrived on the morning trial began, and defense counsel informed the court that they did not know its purpose until the prosecutor began asking Ditmars about the report. (Id. at 98-109.) Following a defense objection, the prosecutor conceded that he had committed a discovery violation by failing to turn over the probation officer's report. (Id. at 98-99, 107.)

Ditmars was declared a hostile witness due to her apparent forgetfulness. (Id. at 124.) She testified that she met Ryan Guerrero through a mutual friend a few months before the Guerrero robbery. (Id. at 126.) Around that time she was involved in sexual relationships with Evan Baltsas, with whom she lived, as well as Jesse Valdez, who she saw "on the side." (Id. at 124, 127-28.) She stayed with Guerrero at his house from time to time in order to get away from Baltsas due to the ups and downs in their relationship; she was able to reach Valdez through Guerrero, because she could not contact Valdez at his home. (Id. at 135-37.)

Ditmars said she had left Baltsas a few days before the Guerrero robbery and stayed at a hotel in downtown San Diego for a day or so, which was paid for by a friend. (Id. at 142-43.) She had no money of her own at that time and supported herself by selling methamphetamine. (Id. at 143-45.) She went to stay with Guerrero for a few days and did not let Baltsas know where she was because she was trying to end their relationship. (Id. at 146-47.) She slept alone in the downstairs bedroom while at Guerrero's house

and made it clear to Guerrero she was not interested in a sexual relationship. (<u>Id.</u> Rep.'s Tr. vol. 2, 267-68, Jan. 25, 2006; <u>id.</u> Rep.'s Tr. vol. 2, 352, Jan. 26, 2006.)

Ditmars testified that on the day before the robbery Guerrero was working on the roof of the house while she remained inside. (<u>Id.</u> Rep.'s Tr. vol. 1, 147-48.)  She became distressed when she was unable to check her voice mail because Baltsas had changed her password.  (<u>Id.</u> Rep.'s Tr. vol. 2, 270-72.)  She was so distressed about her voice mail that she drank five or six shots of Jack Daniels whiskey in about half an hour.  (<u>Id.</u> at 271-72; <u>id.</u> Rep.'s Tr. vol. 1, 150-52.)

Ditmars was nineteen years old at the time of the Guerrero robbery; she testified that she used methamphetamine daily and had used it off and on since she was seventeen.  (<u>Id.</u> Rep.'s Tr. vol. 1, 154; <u>id.</u> Rep.'s Tr. vol. 2, 382.)  She said she was an alcoholic who has experienced blackouts, after which she would not be able to remember what had happened while drinking.  (<u>Id.</u> Rep.'s Tr. vol. 2, 370-71.)  She was used to drinking Jack Daniels, however, and said she was able to drink a half pint in an evening and still remember what she had been doing when she passed out.  (<u>Id.</u> at 369.)

Ditmars said that she was high on methamphetamine around the time of the events; it had been over a year since the incident, and she is now clean and sober and did not want to remember or even try to remember what happened.  (<u>Id.</u> Rep.'s Tr. vol. 1, 157.)  She also said that most of her testimony was based on her memory being refreshed by having recently read a transcript of a statement she gave to the police when she was high and told lies to cover herself.  (<u>Id.</u> Rep.'s Tr. vol. 2, 364-65.)  The prosecutor

presented evidence that no transcript was found in a search of her jail cell. (Id. Rep.'s Tr. vol. 7, 1446-47, Feb. 2, 2006.) The following day, the attorney who represented Ditmars in her criminal case testified that she had reviewed the transcript with Ditmars many times and twice had shown her a video recording of her police interview. (Id. Rep.'s Tr. vol. 8, 1494-97, Feb. 3, 2006.)

Ditmars testified that she and Guerrero smoked methamphetamine together on the day of the robbery, and the last thing she remembered was "flashing" Guerrero about sundown by pulling up her shirt and exposing her breasts. (Id. Rep.'s Tr. vol. 1, 155; id. Rep.'s Tr. vol. 2, 273-74.) She testified on direct examination that Guerrero mixed some of her drinks that day, but on cross-examination, she said that Guerrero did not mix any of her drinks, although he had access to her bottle of Jack Daniels which had been sitting open on the bar for days. (Id. Rep.'s Tr. vol. 1, 125, 155-56; id. Rep.'s Tr. vol. 2, 378-79.)

Ditmars said that the next thing she remembered after flashing Guerrero was waking up in bed with him, both of them naked, at about 4:00 a.m. (Id. Rep.'s Tr. vol. 1, 158-59; id. Rep.'s Tr. vol. 2, 273, 276, 354.) She testified that Guerrero raped her that night, although she admitted she never told the police she had been raped. (Id. Rep.'s Tr. vol. 1, 122-23.) When she woke up, she saw cigarettes and a lighter fresh from the store. (Id. at 276.) She put on her clothes, got a soda, ate some cold pizza, called Baltsas, and then slept for a while in her bedroom. (Id. at 159-60; id. Rep.'s Tr. vol. 2, 276, 354.) She testified that she called Baltsas to come get her because she missed him and felt something improper had happened with Guerrero. (Id. Rep.'s Tr.

vol. 2, 278.)  She did not tell Baltsas she had been raped, but told him that she had awoken in Guerrero's bed without any clothes and thought he had taken advantage of her.  (<u>Id.</u> Rep.'s Tr. vol. 1, 160-61.)  Ditmars gave Baltsas directions to Guerrero's house, and he told her he would be over as soon as he could.  (<u>Id.</u> at 161-62.)

Ditmars fell asleep; when she awoke, she called Baltsas again. (<u>Id.</u> Rep.'s Tr. vol. 2, 279.)  He told her he had just picked up Zingsheim and was on his way over.  (<u>Id.</u>)  She called Baltsas a third time a little later and then waited in the garage where Guerrero's father's Lincoln Navigator was parked.  (<u>Id.</u> Rep.'s Tr. vol. 1, 162-63; <u>id.</u> Rep.'s Tr. vol. 2, 280-81.)

Baltsas arrived with Zingsheim in a grey Volvo about forty-five minutes to an hour after Ditmars first called.  (<u>Id.</u> Rep.'s Tr. vol. 2, 281.)  Although there was room in the driveway, they parked the Volvo two houses away.  (<u>Id.</u> Rep.'s Tr. vol. 1, 163-64.) Ditmars put her personal items in the Volvo along with an X-Box video game and other items she intended to steal from Guerrero. (<u>Id.</u> at 171-72; <u>id.</u> Rep.'s Tr. vol. 3, 477-78.)  Baltsas and Zingsheim went into the garage and sat in the Navigator.  (<u>Id.</u> Rep.'s Tr. vol. 1, 173.)  Baltsas surprised and angered Ditmars when he drove off alone in the Navigator, apparently abandoning her after she had turned to him for help, so she left with Zingsheim in the Volvo.  (<u>Id.</u> at 173, 178-79; <u>id.</u> Rep.'s Tr. vol. 2, 413-14.)

Ditmars testified that Zingsheim drove them to Valdez's house, and along the way she smoked methamphetamine and discussed robbing Guerrero to get even with him.  (<u>Id.</u> Rep.'s Tr. vol. 1, 180-81; <u>id.</u> Rep.'s Tr. vol. 2, 394.)  Ditmars was upset with Baltsas for driving away and leaving her; she and Zingsheim came up with the

idea to rob Guerrero. (Id. Rep.'s Tr. vol. 2, 303, 414.) Valdez was not home so they drove to Petitioner's house. (Id. Rep.'s Tr. vol. 1, 182.)

Maxwell, who lived in Imperial Beach, was home and Murphy was with him. (Id. at 182-83.) They all gathered in Petitioner's garage where Ditmars told Maxwell, Murphy, and Zingsheim what had happened to her and that she wanted to go back and rob Guerrero to get even with him. (Id. at 184-86.) Murphy and Maxwell each had a gun at that time. (Id. at 184-85.) Ditmars denied leaving any of her possessions at Guerrero's house and said she wanted to go there to take Guerrero's property. (Id. Rep.'s Tr. vol. 2, 400.) She said that Maxwell suggested taking her to the hospital. (Id. at 401.)

Ditmars smoked methamphetamine while in Petitioner's garage, and said that she, Maxwell, Murphy, and Zingsheim all got high on methamphetamine. (Id. Rep.'s Tr. vol. 1, 188; id. Rep.'s Tr. vol. 2, 333-34, 341.) Petitioner told Ditmars that he was going to go to Guerrero's house and "kick his ass." (Id. Rep.'s Tr. vol. 1, 185.) Ditmars testified that she was aware that Maxwell had beaten Guerrero up on a previous occasion. (Id. at 188.)

Petitioner drove Ditmars to Guerrero's house in his Toyota 4 Runner while Zingsheim and Murphy drove there in the Volvo. (Id. at 187, 193.) On their way to Guerrero's house, Ditmars and Petitioner discussed the items she wanted to take. (Id. Rep.'s Tr. vol. 2, 207.) When they arrived, Ditmars went straight to Guerrero's bedroom, where he was still sleeping, and took his cell phone so he could not use it to call for help. (Id. Rep.'s Tr. vol. 1, 193-94.) She then went downstairs and began unplugging

stereo equipment to steal, as Maxwell and Murphy went into
Guerrero's bedroom.  (<u>Id.</u> at 194-96.)

Ditmars eventually went back upstairs and saw Guerrero, who
was bleeding, sitting on a couch being watched by Murphy, and she
began removing a flat-screen television from the wall.  (<u>Id.</u> at
197-98; <u>id.</u> Rep.'s Tr. vol. 2, 205.)  Ditmars testified that she
did not see Maxwell or Murphy with guns while they were in
Guerrero's house.  (<u>Id.</u> Rep.'s Tr. vol. 1, 192.)  She admitted she
told the police that Murphy had a gun in his hand while he was
watching Guerrero, but at trial, she testified that she could not
remember whether Murphy had a gun at the time.  (<u>Id.</u> Rep.'s Tr.
vol. 2, 227.)  Ditmars said she went through the closets and
drawers in the three downstairs bedrooms, and carried clothes, wine
bottles, a framed picture, and a stereo out to the Volvo.  (<u>Id.</u> at
207-08.)  She saw all three men carry items out of the house.  (<u>Id.</u>
at 209.)  Ditmars left with Zingsheim in the Volvo at the same time
that Maxwell and Murphy left in Petitioner's Toyota.  (<u>Id.</u> at 209-
12, 214.)

Ditmars said she remembered "flashing" Guerrero by showing him
her breasts the previous evening and recalled telling a police
officer that she thought their sex was consensual, but she also
told the officer she was unsure how to feel about not being able to
remember having sex.  (<u>Id.</u> Rep.'s Tr. vol. 2, 215-16.)  She told
the police that she woke up in the middle of the night and did not
think anything was wrong; she felt safe with Guerrero but felt bad
that she had betrayed Baltsas.  (<u>Id.</u> at 217-18.)  Ditmars heard a
gunshot during the robbery and heard a window shatter at the same
time.  (<u>Id.</u> at 220-21.)

A short video excerpt from an interview Ditmars gave to the police the day she was arrested was played for the jury, regarding matters she could not remember during her testimony. (Id. at 248, 250.) After watching the excerpt, Ditmars testified that Maxwell had a gun underneath a jacket when he left his house to go to Guerrero's house and that Zingsheim and Baltsas put items in the Lincoln Navigator before leaving Guerrero's house. (Id. at 250-51.) The entire interview, which lasted several hours, was played for the jury. (Id. Rep.'s Tr. vol. 3, 539-41; id. Rep.'s Tr. vol. 3, 542-46, Jan. 27, 2006.) A transcript of the interview is in the record. (Lodgment No. 1, Clerk's Tr. vol. 1, 0048-141 (transcript).)

Ditmars provided a statement to a probation officer prior to her sentencing in which she stated that she had been staying with Guerrero for a week prior to the robbery and that the night before the robbery she was drinking whiskey and Bloody Marys, and was smoking methamphetamine with Guerrero. (Lodgment No. 4, Rep.'s Tr. vol. 2, 308; Id. Rep.'s Tr. vol. 3, 504.) She told the probation officer that she awoke at 4:00 a.m. in bed with Guerrero, noticed she was naked, assumed she had been raped, and called Baltsas to pick her up. (Id. Rep.'s Tr. vol. 2, 308; id. Rep.'s Tr. vol. 3, 504-05.) She told the officer that Baltsas showed up with Zingsheim, and they took Guerrero's Lincoln Navigator. (Id. Rep.'s Tr. vol. 2, 308; Id. Rep.'s Tr. vol. 3, 505.)

Ditmars testified that she did not remember telling the probation officer that she had decided stealing the car was not enough for her or that she had asked Zingsheim to drive her to Maxwell's house where they decided to steal Guerrero's personal

belongings and "kick his ass."  (<u>Id.</u> Rep.'s Tr. vol. 2, 308; <u>id.</u> Rep.'s Tr. vol. 3, 505-08.)  She told the probation officer that "when they arrived at [Guerrero]'s house, the guys cut the phone lines and pointed their guns at [Guerrero]."  (<u>Id.</u> Rep.'s Tr. vol. 2, 308; <u>Id.</u> Rep.'s Tr. vol. 3, 507.)  She also said that Zingsheim loaded stolen items into the vehicles and that she heard gunfire and was told to pick up a bullet casing before she left the house. (<u>Id.</u> Rep.'s Tr. vol. 2, 308; <u>id.</u> Rep.'s Tr. vol. 3, 507.)

Ditmars said she told the probation officer that she was sorry for what happened; she should have called the police in the morning and reported the rape; and if she had, she would not be in jail. (<u>Id.</u> Rep.'s Tr. vol. 2, 308; <u>id.</u> Rep.'s Tr. vol. 3, 507-08.)

Bruce Langdon, Murphy's neighbor, testified that he turned a backpack over to the police which had been given to him by Murphy. (<u>Id.</u> Rep.'s Tr. vol. 3, 574, 587.)  The backpack contained two handguns, a revolver, and a semiautomatic.  (<u>Id.</u> at 595-96.)  In an attempt to refresh Langdon's memory, the prosecutor questioned Langdon about a conversation he had with the prosecutor and a detective sometime during the week of the trial.  (<u>Id.</u> at 582.)  A defense objection was sustained based on the prosecutor's failure to notify the defense of that conversation, and the prosecutor was admonished for the discovery violation and ordered not to inquire further about the conversation.  (<u>Id.</u> at 582-84.)

Ryan Guerrero testified that he lived in Arizona but had a family summer vacation home in Coronado, California, in the Coronado Cays development.  (<u>Id.</u> Rep.'s Tr. vol. 5, 1005-07, Jan. 31, 2006.)  Guerrero was doing remodeling work at the home in January 2005; he visited it about once a month for that purpose,

staying two to three weeks at a time depending on what type of work he was doing at the home.  (Id. at 1006-07.)  He met Tuesdae Ditmars, who he knew as Tuesdae Mars, through a friend about three months before the robbery.  (Id. at 1005, 1007.)  He and Ditmars were friends who discussed relationship problems she had with her boyfriend Evan Baltsas, including Ditmars wanting to end the relationship and calling Baltsas a controlling "psycho."  (Id. at 1007-08; id. Rep.'s Tr. vol. 6, 1220-21.)

Guerrero testified that in January 2005, he was acquainted with Maxwell and his codefendants Murphy and Zingsheim, although he did not know Maxwell or Zingsheim's names at that time, and he identified them all in court.  (Id. Rep.'s Tr. vol. 5, 1008-10.) Guerrero had met Murphy about a month earlier through Jesse Valdez, who worked for the stucco and plastering business owned by the Guerrero family and had done some work at the summer home.  (Id. at 1010-11.)  Guerrero admitted that he had lied when he initially told the police that he did not know Maxwell and Murphy.  (Id. Rep.'s Tr. vol. 7, 1307.)

Guerrero testified that he had met Maxwell only once prior to the robbery, when Valdez had brought him to the house.  (Id. Rep.'s Tr. vol. 5, 1012.)  On that occasion, Guerrero opened the door to his garage, saw Maxwell, who stuck out his hand to shake Guerrero's hand and punched Guerrero in the face.  (Id.; id. Rep.'s Tr. vol. 7, 1310.)  Guerrero said he attacked Maxwell in response, got on top of him and punched him twice, and told him to get the hell out. (Id. Rep.'s Tr. vol. 7, 1311.)  Guerrero testified that Maxwell picked up a hammer, which Guerrero took away, and Maxwell told him that the next time Maxwell saw him, "I'll regret it, and I will pay

for what had just happened." (Id. at 1311-12.)  Guerrero thought that altercation resulted because Valdez and Maxwell were upset that Ditmars was staying at Guerrero's home.  (Id. Rep.'s Tr. vol. 5, 1012.)  Ditmars left with Valdez and Maxwell right after that incident.  (Id. at 1013.)  Guerrero said he had met Zingsheim only once or twice before January 29, 2005, though their mutual friend John Gary.  (Id.)

On January 28, 2005, Guerrero finished a job at the summer home with a crew of five guys from Arizona who worked for a week fixing a roof leak and redoing two exterior walls.  (Id.)  Ditmars had been staying at the home for several days that week, while the workmen stayed at a motel in Imperial Beach about ten or fifteen minutes away.  (Id. at 1014, 1016-17.)  Guerrero said he and Ditmars had not had sex at that time, but had flirted a little. (Id. at 1016, 1019.)

Guerrero testified that he drank about three beers while working alone on the roof on January 28, 2005, the day before the robbery, while Ditmars, the only other person in the house, was inside drinking Jack Daniels whiskey she had brought with her. (Id. at 1017-18, 1023.)  When Guerrero finished work for the day, he and Ditmars "kissed a little bit," and she "flashed" Guerrero by lifting her shirt to show him her breasts.  (Id. at 1018-19.) Guerrero asked her to do it again and she obliged.  (Id. at 1019.) They shared a mutual kiss, and Ditmars then performed oral sex on Guerrero.  (Id. Rep.'s Tr. vol. 7, 1324.)  Guerrero carried her up the two steps to his bedroom from the bar area and they had intercourse.  (Id. Rep.'s Tr. vol. 5, 1019; id. Rep.'s Tr. vol. 6, 1140.)  Guerrero said he did not mix any of Ditmars's drinks,

denied drugging Ditmars or forcing her to have sex, and said that she appeared to be in control of herself and gave no indication she did not want to have sex.  (<u>Id.</u> Rep.'s Tr. vol. 5, 1018-20.)

After they had sex, Guerrero went to an Imperial Beach pizza shop where he ate a salad while he waited for a pizza to be prepared, and returned home about forty-five minutes later.  (<u>Id.</u> at 1021.)  He stopped at a liquor store on the way back and purchased cigarettes for Ditmars.  (<u>Id.</u> at 1022.)  Ditmars was still in Guerrero's bed when he returned with the pizza, and he unpacked and set up a new plasma screen television in the bedroom. (<u>Id.</u> at 1025-26.)  Guerrero joined Ditmars in bed and they had sex again, with Ditmars participating and responding, after which they fell asleep with her head on his shoulder.  (<u>Id.</u> at 1026-28.)

Guerrero testified that he awoke about daybreak and saw Murphy and Maxwell in his bedroom.  (<u>Id.</u> at 1029.)  Petitioner was holding an assault rifle, and Murphy was holding a handgun.  (<u>Id.</u> at 1033-34, 1037.)  Maxwell showed Guerrero that the rifle was loaded by removing the clip and displaying the bullets, and then cocking the gun and chambering a round.  (<u>Id.</u> at 1134-35.)  The house is equipped with an alarm system with three buttons marked "fire," "medical," and "police."  (<u>Id.</u> at 1031.)  Guerrero eventually learned that the wires had been cut where they enter the house, and the alarm system disabled.  (<u>Id.</u> at 1031-32.)  He testified that he did not usually set the alarm when he was staying at the house, and the alarm wires could have been cut anytime after he arrived on January 25th.  (<u>Id.</u> Rep.'s Tr. vol. 7, 1319-20.)

Guerrero asked Maxwell and Murphy, "What the fuck are you doing in my house?"  (<u>Id.</u> Rep.'s Tr. vol. 5, 1035.)  Before he

could say anything else, Murphy jumped on the bed and they were both "in [his] face." (Id.)  Guerrero said he grabbed the barrel of Maxwell's rifle as Murphy tried to kick him. (Id. at 1036-37.) Petitioner hit Guerrero with the butt of the rifle, and Murphy hit Guerrero in the head with the butt of the handgun. (Id. at 1036-38.)  Guerrero saw the bedroom window shatter and, as he was naked, asked permission to put on clothes. (Id. at 1039-40.)  He asked them if this was about his previous altercation with Maxwell, but they told him that it was about "doing more with a girl than she wants to do." (Id. at 1040-41.)  They also told him he was lucky they did not shoot him in his genitals. (Id. at 1041.)

Guerrero said he tried to talk sense into Murphy and Maxwell, and told them they were a little old to be just taking a woman's word that she was raped. (Id. at 1042.)  Petitioner said something like, "She better not have been fucking lying to us." (Id.) Maxwell left the bedroom as Ditmars entered wearing Guerrero's cell phone clipped to her skirt, and Murphy asked her to look for a bullet casing. (Id. at 1043-44; id. Rep.'s Tr. vol. 6, 1204.) Ditmars found the bullet casing, and Murphy put it in his pocket. (Id. Rep.'s Tr. vol. 5, 1044.)  Guerrero said to Ditmars, "This is because of you, you fucking bitch." (Id.)  Ditmars replied by saying something like, "All I know, I passed out, and when I woke up, I felt really weird, and I was naked." (Id.)

Guerrero testified that Murphy ordered him at gunpoint into the living room/kitchen area and onto a couch. (Id. at 1044-46; Id. Rep.'s Tr. vol. 6, 1133.)  Guerrero said that Zingsheim was wearing long socks on his hands rolled up to his elbows and was taking televisions and telephones off the walls. (Id. Rep.'s Tr.

vol. 5, 1047-48.)  Guerrero testified that Murphy held him at
gunpoint for about half an hour while Zingsheim and Ditmars carried
off his possessions.  (Id. at 1050, 1052; id. Rep.'s Tr. vol. 6,
1133-34.)  Guerrero did not know where Petitioner was during the
time he was being held on the couch, but Guerrero heard rummaging
noises coming from downstairs during that time.  (Id. Rep.'s Tr.
vol. 5, 1051; id. Rep.'s Tr. vol. 6, 1133-34.)  Murphy drank a few
beers and ate some pizza during that time, and Guerrero heard
Maxwell, Murphy, and Zingsheim discuss disabling the alarm system.
(Id. Rep.'s Tr. vol. 6, 1156-62.)  All the telephones in the house
were taken during the robbery, and Guerrero's father's Lincoln
Navigator was missing from the garage.  (Id. Rep.'s Tr. vol. 5,
1053-54.)

As they were all leaving, Murphy told Guerrero, "If you call
the cops, they may catch all of us, but they are not going to catch
one, and the one they don't catch is going to kill your ass, so
don't call the fucking cops, . . . ."  (Id. at 1056-57.)  Guerrero
followed all four robbers out of the house and watched them walk
down his driveway.  (Id. at 1057.)  He saw Zingsheim and Ditmars
drive away in a grey Volvo, which had been parked in the garage,
and saw Murphy and Maxwell drive away in a Toyota, which had been
parked on the street.  (Id. at 1058-59.)

Guerrero called the police from a neighbor's house after
unsuccessfully attempting to activate the alarm in the garage.
(Id. at 1059-60.)  He gave a statement to a responding police
officer and was subsequently treated for a cut on his head at the
hospital; Guerrero had suffered some injuries to his arm and back.
(Id. at 1061-62; Id. Rep.'s Tr. vol. 6, 1138-39, 1171-75.)  A

police officer who responded to the scene observed a bullet hole in Guerrero's bedroom window. (<u>Id.</u> Rep.'s Tr. vol. 4, 719, Jan. 30, 2006.)

Guerrero admitted at trial that he had smoked methamphetamine with Ditmars while she was staying with him and admitted that he had lied to a police detective when he denied doing so. (<u>Id.</u> Rep.'s Tr. vol. 7, 1389-91.) He admitted he had testified untruthfully under oath at the preliminary hearing when he said he had not lied to the detective. (<u>Id.</u> at 1393-96.) Guerrero admitted he had lied to the jury during the trial when he said that he had not spoken with anyone from the police or district attorney's office prior to testifying. (<u>Id.</u> Rep.'s Tr. vol. 6, 1209-12, 1270-71; <u>id.</u> Rep.'s Tr. vol 7, 1429-30.)

A Coronado Police Officer testified that he received a radio dispatch regarding a home invasion robbery at Guerrero's residence and observed a grey Volvo sedan matching the description of a vehicle involved in the robbery. (<u>Id.</u> Rep.'s Tr. vol. 4, 659-61.) The vehicle was stopped and the driver, Zingsheim, and passenger, Ditmars, were taken into custody. (<u>Id.</u> at 663-65.) Items belonging to Guerrero were in the car. (<u>Id.</u> at 747-54; <u>Id.</u> Rep.'s Tr. vol. 6, 1187-94.) Guerrero's father's Lincoln Navigator was found parked outside Baltsas's motel two days later, and the vehicle's registration and other records were found inside Baltsas's room. (<u>Id.</u> Rep.'s Tr. vol. 4, 697-98; <u>Id.</u> Rep.'s Tr. vol. 5, 919-20.)

A police officer testified that in an interview with the police, Murphy said that on the morning of the Guerrero robbery, he had just gotten back from hitting golf balls to find Ditmars crying

10cv1697

and saying Guerrero had raped her in her sleep.  (<u>Id.</u> Rep.'s Tr. vol. 5, 904.)  Murphy told the officer that he believed Guerrero had tried something with Ditmars once before when Valdez was there.  (<u>Id.</u>)  The officer testified that Murphy said he went along with the others in order to scare the hell out of Guerrero because his mom and sister had been raped, and although he no longer thought Ditmars was telling the truth, he believed it at the time because "[s]he put on a pretty good act."  (<u>Id.</u> at 904.)  Murphy told the police that he did not know that the others intended to rob Guerrero, and he took nothing himself but just hit Guerrero once with the handgun that went off accidentally and shot a hole in the window.  (<u>Id.</u> at 907-08.)  He told the officer he threw the gun in the ocean because he was scared.  (<u>Id.</u> at 909.)

Petitioner's neighbor, Mike Vendetti, testified that he ran into Maxwell on the morning of the robbery, and Maxwell told him "there was a problem with a woman getting raped, and he was going to defend her honor . . . ."  (<u>Id.</u> at 994-95, 999.)  "He was going to kick his ass."  (<u>Id.</u> at 995.)  The defense called Bradley Russell, another neighbor of Maxwell's, who testified that after someone broke into his garage and stole tools, Maxwell purchased some of the stolen tools and returned them after seeing Russell's name engraved on them.  (<u>Id.</u> Rep.'s Tr. vol. 8, 1473-75.)  Russell saw Maxwell about 6:20 a.m. on January 29, 2005, driving his Toyota 4 Runner, and he asked Petitioner if he was doing a landscaping job and planning to borrow tools that day.  (<u>Id.</u> at 1475-77.)  Maxwell told him yes but that he had to go out to Coronado Cays real quick to retrieve some property that belonged to a friend.  (<u>Id.</u> at 1477, 1483.)  At 6:53 a.m. that same morning, Maxwell backed his Toyota

into Russell's driveway, and Russell put the tools in the back of the vehicle, which was empty. (<u>Id.</u> at 1478.) Russell said there was a passenger in Maxwell's Toyota that he did not get a good look at, but he told an investigator it was probably Murphy. (<u>Id.</u> at 1479, 1489.) Russell, who had three felony convictions on his record, said Maxwell did not seem upset at that time. (<u>Id.</u> at 1479, 1482.)

Petitioner testified on his own behalf. He testified that in January 2005 he lived with his mother in his parent's house in Imperial Beach and was good friends with his codefendant Mike Murphy. (<u>Id.</u> at 1499-1500.) He met Jesse Valdez in 2003 and said Valdez was a friend of a friend. (<u>Id.</u> at 1500.) Valdez worked for Guerrero for a brief time in 2004; and Maxwell met Guerrero through Valdez. (<u>Id.</u> at 1500-01.) Maxwell knew Tuesdae Ditmars as Valdez's girlfriend. (<u>Id.</u> at 1501.)

Maxwell denied ever owning an assault weapon or semiautomatic rifle, although he had inherited some firearms his mother was forced to sell in 1995 after he was convicted of a felony. (<u>Id.</u> at 1504-05.) No assault-type weapon was found in a search of Maxwell's house. (<u>Id.</u> Rep.'s Tr. vol. 5, 943.) He told the jury that his prior felony involved violence but had been reduced to a misdemeanor in 1998. (<u>Id.</u> Rep.'s Tr. vol. 8, 1604.) On direct examination, Maxwell testified that he had, in the past, tried to sell an assault weapon, a semiautomatic rifle. (<u>Id.</u> at 1505.) A friend of his named Sierra was moving to Mexico and asked Maxwell if he could help him sell the semiautomatic rifle. (<u>Id.</u> at 1505-06.) Although Maxwell could not find a buyer, he said he had described the firearm in detail over the telephone to Valdez and

Guerrero when those two were working in Arizona.  (<u>Id.</u> at 1505-09.)
Maxwell stated that he never had the weapon in his possession.
(<u>Id.</u> at 1506.)

In mid-December of 2005, Petitioner and Valdez went to
Guerrero's home in the Coronado Cays one morning at about 8:00 a.m.
to pick up Ditmars.  (<u>Id.</u> at 1509-13.)  Valdez had received a call
from her asking to be picked up because Guerrero would not give her
a ride back to Valdez's home.  (<u>Id.</u> at 1513.)  Petitioner rang
Guerrero's doorbell and yelled for Ditmars as Valdez stayed in the
car.  (<u>Id.</u> at 1513-15.)  Guerrero appeared at the utility door to
the garage and told Petitioner Ditmars was not there.  (<u>Id.</u> at
1514.)  Maxwell, walking with a crutch as a result of a dirt bick
accident, went halfway into the garage and saw Ditmars.  (<u>Id.</u> at
1510, 1514-15.)  Guerrero took a swing at Maxwell, who swung back
but fell to the ground when his knee gave out.  (<u>Id.</u> at 1515.)
Petitioner said Guerrero kicked the crutch out of his hand and then
kicked him in the back and ribs.  (<u>Id.</u>)  As Guerrero went back
inside the house, Ditmars came out and joined Valdez in the car and
Maxwell followed.  (<u>Id.</u> at 1516.)  Petitioner denied grabbing a
hammer or threatening Guerrero in any way on that occasion.  (<u>Id.</u>)
He saw Guerrero twice in passing after that incident but did not
threaten to get even with him.  (<u>Id.</u> at 1518-19.)

Maxwell said he got up early and hit golf balls with Murphy on
January 29, 2005; they also intended to do some yard work at
Murphy's house that day.  (<u>Id.</u> at 1519.)  Each had a couple of
beers while hitting the balls.  (<u>Id.</u> at 1574-75.)  He and Murphy
returned to Petitioner's parents' house to prepare for work.  (<u>Id.</u>
at 1521.)  Soon thereafter, Ditmars arrived in a Volvo, wearing a

one-piece nightgown; she looked as though she had been crying and said she had been raped by Guerrero. (Id. at 1523-25.) Petitioner asked her why she went back to Guerrero's house and what had happened. (Id. at 1526.) She told him she woke up next to Guerrero naked. (Id.) Maxwell asked her what she wanted to do, and she told him, "I want to get my stuff back." (Id.) Maxwell talked Ditmars into going to the hospital, but she told him she had left her purse and identification at Guerrero's house. (Id. at 1527.)

Ditmars used the bathroom and then told Petitioner that she had really wanted to go to Valdez's house but he was not home. (Id. at 1529.) Maxwell told her that Valdez was in custody at that time for a probation violation. (Id.) Ditmars then asked Petitioner to take her back to Guerrero's house, and she told him she was afraid that Guerrero would not let her leave again if she went back. (Id. at 1530.) Maxwell told her that if he took her back, she was going to have to wake Guerrero and tell him that she was there to get her things, including her identification, and then go to the hospital. (Id. at 1530, 1542.) Maxwell denied that he and Ditmars discussed stealing anything from Guerrero or going there to kick his ass. (Id. at 1530.) Rather, he said he wanted to diffuse the situation. (Id.) Petitioner testified that Guerrero had initiated the violence during their previous encounter, and Ditmars was concerned that if she returned to Guerrero's house he might become aggressive and not allow her to leave. (Id. at 1530-31.)

Maxwell drove Ditmars to Guerrero's house in his Toyota while Murphy, who Maxwell knew to be a friend of Guerrero's, went there

in the Volvo with Zingsheim, whom Maxwell had never met.  (<u>Id.</u> at
1532, 1534.)  They left for Guerrero's residence at 5:30 a.m. and
were back in forty-five minutes.  (<u>Id.</u> at 1535.)  Petitioner denied
taking a weapon of any type and denied discussing whether to kick
Guerrero's ass or rob him.  (<u>Id.</u> at 1532-33.)  He said his neighbor
Russell came up just as he was leaving, and the two of them had a
very brief conversation about borrowing some tools.  (<u>Id.</u> at 1535-
37.)

When they arrived at Guerrero's house, Maxwell dropped Ditmars
off in the driveway and parked his Toyota about five or six houses
away.  (<u>Id.</u> at 1538.)  Maxwell, Murphy, and Ditmars entered the
house through the garage and went directly to Guerrero's bedroom.
(<u>Id.</u> at 1539-39.)  Petitioner set his keys down on the bar along
the way.  (<u>Id.</u> at 1540.)  Ditmars woke up Guerrero by grabbing his
arm.  (<u>Id.</u> at 1541-42.)  Maxwell told Ditmars to tell Guerrero they
were there to get her belongings and then go to the hospital.  (<u>Id.</u>
at 1542-43.)  Guerrero got upset, called Ditmars a bitch and lunged
at her.  (<u>Id.</u> at 1543.)  Petitioner said he put himself between
Guerrero and Ditmars, preventing Guerrero from touching Ditmars,
and pushed Guerrero back.  (<u>Id.</u> at 1543-44.)  Maxwell told Ditmars
to gather her things and she left the room.  (<u>Id.</u> at 1544.)

Maxwell testified that he told Guerrero to chill out and that
he had better worry about what he was going to tell the police when
they arrived, or save his story for the police, because he intended
to report the rape at the hospital.  (<u>Id.</u> at 1544, 1615.)  Guerrero
tried to explain what happened, but Petitioner told him he did not
want to hear what he had to say and left the room.  (<u>Id.</u> at 1545.)
Maxwell denied having a firearm or any type of weapon and denied

kicking or punching Guerrero.  (<u>Id.</u> at 1545.)  He said he did not hear a gunshot and never saw Murphy with a gun.  (<u>Id.</u> at 1547, 1571-72.)

Petitioner observed Ditmars leaving with items he believed did not belong to her and noticed the house looked ransacked.  (<u>Id.</u> at 1547-48, 1550.)  He then told Ditmars, "Fuck this.  I don't know what the hell's going on here.  I don't want any fucking part of this."  (<u>Id.</u> at 1548.)  Petitioner went to his truck to leave but realized he did not have his keys.  (<u>Id.</u> at 1548-49.)  When he went back into the house and picked up his keys, he saw Murphy, Guerrero, and Ditmars in the family room.  (<u>Id.</u> at 1549.)  Guerrero was siting on a couch, and Murphy was standing next to a fireplace drinking a beer and smoking a cigarette.  (<u>Id.</u> at 1549, 1614.)  Maxwell told Murphy, "This bitch has got us into a bunch of fucking mess now."  (<u>Id.</u> at 1550.)  Petitioner then said to Guerrero, "You know exactly why I came here, what my part in this was."  (<u>Id.</u>)  He told Murphy, "I'm leaving now, if you want a ride."  (<u>Id.</u>)

Maxwell and Murphy returned to Maxwell's house in the Toyota.  (<u>Id.</u>)  Along the way they stopped at Russell's house to pick up tools.  (<u>Id.</u> at 1551.)  They then went to Murphy's house and worked on installing a sprinkler system.  (<u>Id.</u> at 1554-55.)  Petitioner said he did not see Murphy take anything from Guerrero's house and that nothing from the house was put into his Toyota.  (<u>Id.</u> at 1550-51.)  As Maxwell was leaving, he saw Zingsheim getting out of the Volvo, but he did not see Zingsheim take anything from the house or load anything into the Volvo.  (<u>Id.</u> at 1577.)  Petitioner denied telling his neighbor, Mike Vendetti, that he was on his way to
///

Coronado to kick someone's ass, but he told Vendetti that he had to take care of something for a friend in Coronado.  (Id. at 1582.)

Maxwell said he was at a friend's house about 11:00 p.m. that evening when his house was raided by a SWAT team.  (Id. at 1555, 1568-69.)  He spoke to his mother the next day, who told him the police were looking for assault rifles.  (Id. at 1583.)  Petitioner said he knew he did not have any guns at his house, but because he was on probation he called a lawyer, a family friend, and was told the lawyer would not be in his office until Monday.  (Id. at 1556, 1583-84.)  Maxwell went to see the lawyer on Monday.  (Id. at 1556.)  He planned on turning himself in but was apprehended at gunpoint by a fugitive task force in El Cajon.  (Id. at 1557.)

Maxwell testified that, on the advice of counsel, he did not speak to the El Cajon police officers who arrested him.  (Id. at 1559-60.)  After he was transferred to the custody of the Coronado police, however, he told an officer, "This is what you get for helping a girl get away from an estranged guy."  (Id. at 1560.)  A Coronado police officer had previously testified that when Petitioner was arrested he made the following statement: "You don't know the half of it.  That's what happens when you help a girlfriend help a boyfriend."  (Id. Rep.'s Tr. vol. 4, 705.)

A medical expert testified regarding the effects of methamphetamine use and abuse.  (Id. Rep.'s Tr. vol. 9, 1695-1725, Feb. 6, 2006.)  The expert testified that persons using methamphetamine could suffer paranoid delusions with memories based on distorted information, and people taking methamphetamine together could have shared delusions.  (Id. at 1702-10.)  The expert also stated that it was possible for a person using

10cv1697

methamphetamine in the morning after an alcoholic blackout the night before to become delusional about what had happened the previous night. (Id. at 1710-11.)

On February 7 and 8, 2006, the jury heard closing arguments, were instructed, and began their deliberations. (Id. Rep.'s Tr. vol. 10, 1962-2040, Feb. 7, 2006; id. Rep.'s Tr. vol. 11, 2048-2197, Feb. 8, 2006; id. Rep.'s Tr. vol. 12, 2208-85, 2293-2339, Feb. 9, 2006.)

After deliberating a little over two and one-half days, the jury found Maxwell guilty on all charges and found true the allegation that he had personally used a firearm. (Id. Rep.'s Tr. vol. 12, 2339, 2346; id. Rep.'s Tr. vol. 12, 2347-48, Feb. 10, 2006; id. Rep.'s Tr. vol. 14, 2511-13, Feb. 14, 2006; id. Rep.'s Tr. vol. 14, 2514-20, Feb. 15, 2006; Lodgment No. 1, Clerk's Tr. vol. 4, 0685-96 (verdicts).) Petitioner's codefendants were also convicted on all charges, with the exception of count eight (disabling an alarm system), for which Maxwell alone was found guilty. (Lodgment No. 4, Rep.'s Tr. vol. 14, 2521-32.)

Petitioner waived his right to a jury trial regarding the prior conviction allegation and admitted it was true. (Lodgment No. 4, Rep.'s Tr. vol. 14, 2537-38, 2546.) The prior conviction was dismissed in order to avoid a mandatory term under the three strikes law, although it was used to enhance the sentence, and Maxwell was sentenced to twenty-one years in state prison. (Id. at 2558-61.) His sentence was later reduced to nineteen years and four months. (Lodgment No. 28, Rep.'s Tr. vol. 1, 9-13, Feb. 25, 2009.)

///

10cv1697

## IV.   <u>PETITIONER'S CLAIMS</u>

Under the umbrella of three major claims, Maxwell raises multiple interrelated subclaims in his Petition.  In claim one, he argues that four instances of prosecutorial misconduct violated his right to due process under the Fourteenth Amendment to the United States Constitution.  (<u>See</u> Pet. 5-6, ECF No. 1; Mem. P. & A. Supp. Pet. 14-30, ECF No. 1.)  He contends the prosecutor improperly questioned him about his silence at previous court proceedings, asked unfounded questions to Ditmars regarding her fear of retaliation from Petitioner, questioned Petitioner about a photograph of a firearm which had been excluded in a pretrial order, and presented his personal belief of guilt in his final argument to the jury.  (<u>Id.</u>)

In claim two, Maxwell alleges that, to the extent the Court is precluded from reaching the merits of claim one due to a procedural bar imposed as a result of the failure to contemporaneously object at trial to the instances of prosecutorial misconduct, he is nevertheless entitled to habeas relief because he received ineffective assistance of counsel at trial and on appeal in violation of the Fifth, Sixth, and Fourteenth Amendments due to counsels' failure to preserve the claims.  (Pet. at 6-7, ECF No. 1; <u>id.</u> Mem. P. & A. Supp. Pet. 37-38.)  Although not specifically identified as a separate claim in the Petition, Maxwell argues that the cumulative impact of all of these errors denied him a fair trial.  (<u>See</u> Pet. 7, ¶ 16, ECF No. 1; <u>id.</u> Mem. P. & A. Supp. Pet. 38-39.)

///

///

V.    **DISCUSSION**

A.    **Scope of Review**

Title 28, United States Code, § 2254(a), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases[]" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from

[the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . . ." Williams, 529 U.S. at 412. In order to satisfy § 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

The Supreme Court has indicated that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. ___, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v.

-33-

_Alvarado_, 541 U.S. 652, 664 (2004).)  The Court in _Harrington_, in

interpreting section 2254(d)(1), explained:

> As a condition for obtaining habeas corpus from a federal
> court, a state prisoner must show that the state court's
> ruling on the claim being presented in federal court was
> so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any
> possibility for fairminded disagreement.

_Id._ at 786-87.

"If this standard is difficult to meet, that is because it was

meant to be." _Id._ at 786.  "It preserves authority to issue the

writ in cases where there is no possibility fairminded jurists

could disagree that the state court decision conflicts with this

Court's precedents." _Id._

**B.   <u>Analysis</u>**

1.   <u>Claim One:  Prosecutorial Misconduct</u>

In claim one, Maxwell alleges that his right to due process

under the Fourteenth Amendment was violated as a result of the four

instances of prosecutorial misconduct identified above. (<u>See</u> Pet.

5-6, ECF No. 1; <u>id.</u> Mem. P. & A. Supp. Pet. 14-30.)  Respondent

replies that Petitioner's prosecutorial misconduct claims are

procedurally defaulted because the state court found the claims had

been forfeited due to a failure to contemporaneously object and/or

to request the jury be admonished to disregard the alleged

misconduct. (Answer Attach. #1 Mem. P. & A. 20-21, ECF No. 7.)

Alternately, Respondent argues the that adjudication of claim one

by the state appellate court was neither contrary to, nor involved

an unreasonable application of, clearly established federal law and

was not based on an unreasonable determination of the facts. (<u>Id.</u>

at 21-44.)

Maxwell raised his claims of prosecutorial misconduct in a petition for review filed in the California Supreme Court on direct appeal. (Lodgment No. 24, Petition for Review, <u>People v. Zingsheim</u>, No. SD2006802244.) That court denied the petition without a citation of authority or a statement of reasoning. (Lodgment No. 25, <u>People v. Zingsheim</u>, No. S165976, order.) Maxwell also presented the claims to the state appellate court on direct appeal, and they were denied in an unpublished opinion after that court consolidated his appeal with those of his codefendants. (<u>See</u> Lodgment No. 13, Appellant's Opening Brief, <u>People v. Maxwell</u>, No. D049189, slip op.; Lodgment No. 22, <u>People v. Zingsheim</u>, No. D049189, slip op. at 27-48.) The appellate court found that Maxwell had technically forfeited or waived the claims by failing to properly object at trial or request curative instructions, but went on to deny them on their merits. (<u>See</u> Lodgment No. 22, <u>People v. Zingsheim</u>, No. D049189, slip op. at 35-36, 38-39, 44-45, 57-58.)

In <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804 (1991), the Supreme Court adopted a presumption which gives no effect to unexplained state court orders but "looks through" them to the last reasoned state court decision. Accordingly, this Court will look through the silent denial by the state supreme court to the appellate court opinion, which is the last reasoned state court opinion which addresses the claims raised in claim one here. <u>Id.</u>

### a.   Procedural Default

Respondent first contends claim one is procedurally defaulted because the appellate court found that the prosecutorial misconduct claims had been forfeited due to the failure to contemporaneously object at trial or request curative instructions. (Answer Attach.

1   #1 Mem. P. & A. 20-21, ECF No. 7.) Respondent contends the Ninth

2   Circuit has recognized that California's contemporaneous objection

3   rule is independent of federal law and consistently applied, and

4   cites authority to that effect. (Id. at 21.)

5       Petitioner replies that Respondent has failed to carry the

6   burden of establishing that the rule applied in this case has been

7   consistently applied in California. (Traverse Attach. #1 Mem. P. &

8   A. 2-5, ECF No. 11.) He contends the Ninth Circuit has drawn a

9   distinction between application of California's contemporaneous

10  objection rule where a party has failed to make <u>any</u> objection to

11  the admission of evidence and where, as here, an objection was

12  made, "albeit imperfectly in stating grounds." (Id. at 5.)

13  Petitioner agrees that the Ninth Circuit has found the

14  contemporaneous objection rule to have been consistently applied in

15  California in the first situation but contends the Ninth Circuit

16  has found that the rule has not been consistently applied in the

17  second situation. (Id.)

18      When a state court rejects a federal claim based upon a

19  violation of a state procedural rule which is adequate to support

20  the judgment and independent of federal law, a habeas petitioner

21  has procedurally defaulted his claim. <u>Coleman v. Thompson</u>, 501

22  U.S. 722, 729-30 (1991). A state procedural rule is "independent"

23  if it is not interwoven with federal law. <u>LaCrosse v. Kernan</u>, 244

24  F.3d 702, 704 (9th Cir. 2001). A state procedural rule is

25  "adequate" if it is "clear, consistently applied, and

26  well-established" at the time of the default. <u>Calderon v. United</u>

27  <u>States District Court</u>, 96 F.3d 1126, 1129 (9th Cir. 1996). The

28  Court may still reach the merits of a procedurally defaulted claim

1  if the petitioner can demonstrate cause for the procedural default

2  and actual prejudice resulting from the default, or if the failure

3  of the Court to review the claim would result in a fundamental

4  miscarriage of justice.  <u>Coleman</u>, 501 U.S. at 750.

5      Respondent has the initial burden of pleading as an

6  affirmative defense that Maxwell's failure to satisfy a state

7  procedural bar forecloses federal habeas review.  <u>Bennett v.</u>

8  <u>Mueller</u>, 322 F.3d 573, 586 (9th Cir. 2003).  Respondent has carried

9  that burden by pleading that Petitioner's prosecutorial misconduct

10  claims were found to be forfeited due to defense counsel's failure

11  to interpose a specific and timely objection at trial or request

12  curative instructions.  (Answer Attach. #1 Mem. P. & A. 20-21, ECF

13  No. 7.)  The fact that the state appellate court applied the

14  procedural bar <u>and</u> reached the merits of the claims does not bar

15  Respondent from pressing a procedural default argument.  <u>Harris v.</u>

16  <u>Reed</u>, 489 U.S. 255, 264 n. 10 (1989).

17      The burden has therefore shifted to Petitioner to challenge

18  the independence or adequacy of the procedural bar.  <u>Bennett</u>, 332

19  F.3d at 586.  If Petitioner makes a sufficient showing, the

20  ultimate burden of proof falls on Respondent.  <u>Id.</u>  Maxwell

21  attempts to shift the burden back to Respondent by arguing that

22  California's contemporaneous objection rule is not consistently

23  applied where a contemporaneous objection was made but on

24  "imperfectly stated grounds."  (Traverse Attach. #1 Mem. P. & A. 2-

25  5, ECF No. 11.)

26      The Court need not determine whether Petitioner has made a

27  sufficient showing so as to shift the burden back to Respondent or

28  whether Respondent has carried the ultimate burden of demonstrating

that California consistently applies the procedural bar at issue here. The interests of judicial economy favor reaching the merits of Maxwell's prosecutorial misconduct claims regardless of the adequacy of the procedural bar applied by the state court. The Ninth Circuit has indicated that "[p]rocedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")). District courts have applied the same rationale. See Levi v. Almager, No. CV 08-4261-PSG (CW), 2011 WL 2672351, at *3 n.1 (C.D. Cal. May 6, 2011) (deciding merits of delayed access to law library claim rather than resolving the procedural-bar question first.)

The California Court of Appeal, in addition to holding that the prosecutorial misconduct claims were forfeited, concluded that they failed on their merits. This Court finds, for the reasons discussed below, that the appellate court's merits determination is objectively reasonable within the meaning of § 2254(d). Thus, addressing the procedural default would not change the outcome of this proceeding. The state court denied the ineffective assistance of counsel claims and the cumulative error claim on the basis that the prosecutorial misconduct claims failed on their merits. Furthermore, this Court's analysis of the ineffective assistance of counsel claims necessarily requires addressing the state court's determination of the merits of the prosecutorial misconduct claims.

A similar determination would be required when examining whether cause exists to excuse a procedural default due to ineffective assistance of counsel. <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). Likewise, the merits of the prosecutorial misconduct claims would need to be examined to determine whether prejudice exists in the context of a procedural default. <u>Coleman</u>, 501 U.S. at 750.

The Court must examine the merits determination of the prosecutorial misconduct claims by the appellate court in any case. Judicial economy counsels reaching the merits of Maxwell's prosecutorial misconduct claims without a determination of whether the state procedural bar applied in this case was clearly established and had been consistently applied by the California courts. <u>See Levi v. Almager</u>, 2011 WL 2672351, at *3 n.1.

### b. Doyle Error

Maxwell first contends the prosecutor committed misconduct when he cross-examined Petitioner about his decision to invoke his right to remain silent upon arrest and his decision not to testify at the preliminary hearing. (Pet. 6, ECF No. 1; <u>id.</u> Mem. P. & A. Supp. Pet. 14-25, ECF No. 1) (citing <u>Doyle v. Ohio</u>, 426 U.S. 610, 618-19 (1976) (holding that it is a violation of federal due process for a prosecutor to use the post-arrest silence of a defendant who has received <u>Miranda</u> warnings "to impeach an explanation subsequently offered at trial[]").)

Respondent Cate answers that the state appellate court's determination that any <u>Doyle</u> error was not prejudicial is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and was not based on an unreasonable

determination of the facts.  (Answer Attach. #1 Mem. P. & A. 29, ECF No. 7.)  Respondent also argues that in light of the overwhelming evidence of Petitioner's guilt, any <u>Doyle</u> error was clearly harmless.  (<u>Id.</u> at 29-32.)

Maxwell testified on direct examination that when his house was raided by the police, he sought the advice of a lawyer named Jack Phillips.  (Lodgment No. 4, Rep.'s Tr. vol. 8, 1555-56.)  He said he planned on turning himself in, but was apprehended in El Cajon before he could do so.  (<u>Id.</u> at 1557.)  He testified that, on advice of counsel, he did not speak to the El Cajon police officers upon his arrest.  (<u>Id.</u> at 1559-60.)  After he had been transferred to the custody of the Coronado Police, however, he said he told an officer, "This is what you get for helping a girl get away from an estranged guy."  (<u>Id.</u> at 1560.)

The prosecutor's cross-examination proceeded as follows:

Q. Now, sir, you told us, did you not, that your attorney Jack Phillips told you not to talk to the police; right?  [¶]  Didn't you tell us - - that's what you testified on direct?

A. He told me I should invoke my Fifth Amendment and tell them I retained counsel.

Q. And you followed his instructions; right?

A. Yes.

Q. Based on his instructions, you didn't give a statement to the police?

[Petitioner's counsel]:  Objection.  Misstates the evidence.

The court:  Sustained.

[Prosecutor]:

Q. Well, did you give a statement to the police then?

A. I didn't think it was a statement.  It was more of a comment.

1

2      Q.    Other than the comment that we are talking
             about with Detective Hutchins, you didn't
3            provide a statement; right?

4      A.    No.

5      Q.    Okay.  You didn't testify at the preliminary
             hearing in your case, did you?

6      [Zingsheim's counsel]:  Your Honor, I object to this line
             of inquiry.  It's a violation of his constitutional
7            rights.

8      The court:  Sustained.

9      [Prosecutor]:

10     Q     Well, you were in court for your preliminary
             hearing; right?
11
       A.    Correct.
12
       Q.    And you were – – you have been in court for all
13           your hearings; right?

14     A.    Yes.

15     Q.    And you've reviewed all the – – you've heard
             the witnesses testifying at your various
16           hearings; right?

17     A.    Yes.

18     Q.    And you went through the discovery in your
             case; right?  [¶]  In other words, you had a
19           chance to review the reports and things?

20     A.    Yes.

21     Q.    You went over that with your attorney prior to
             testifying here; right?
22
       A.    Yes.
23
       Q.    And now you are telling your story to this
24           jury; right?

25     A.    I am not telling a story.  I am testifying to
             the facts.
26
       Q.    I understand.  [¶]  But this has been your
27           opportunity to tell your story; right?

28     [Zingsheim's counsel]:  Objection.  Argumentative.

                              -41-                          10cv1697

1    The court:  Sustained.

2    [Prosecutor]:

3    Q.   This is the first time you've told the facts;
          right?

4
     [Murphy's counsel]:  Speculation, Your Honor.  Lack of
5         foundation.

6    The court:  Sustained.

7    [Prosecutor]:

8    Q.   As far as it relates to court or law
          enforcement; right?  [¶]  This is the first
9         time; right?

10   [Petitioner's counsel]:  Judge, I believe its going to
          get into, again, what [Zingsheim's Counsel]
11        previously made the same objection to.

12   The court:  Sustained.

13   [Prosecutor]:

14   Q.   I'll withdraw the question.

15   (Id. at 1604-07.)

16        At the beginning of the next court day, Petitioner's counsel,

17   joined by Zingsheim's counsel, requested a mistrial, arguing that

18   the prosecutor committed error under Griffin v. California, 380

19   U.S. 609, 613-15 (1965) (finding a Fifth Amendment violation, as

20   incorporated within the Fourteenth Amendment, arising from a

21   prosecutor asking a jury to infer guilt based on a defendant's

22   decision not to testify) (Lodgment No. 4, Rep.'s Tr. vol. 9, 1690-

23   93.)  The trial judge deferred ruling on the motion until a

24   transcript of Petitioner's direct testimony had been prepared and

25   permitted a written motion to be filed.  (Id. at 1693-94.)

26        Two days later, during a break in Maxwell's counsel's closing

27   argument, the prosecutor insisted upon a ruling on the mistrial

28   motion, arguing that the issue needed to be decided before a

-42-

verdict was returned.  (Id. Rep.'s Tr. vol. 11, 2045-46.)  Defense
counsel indicated that they had not had time to review the
transcript of Petitioner's testimony, and the matter was put over
until after closing arguments.  (Id. at 2048.)  Maxwell's counsel
provided the trial judge with a two-page synopsis of the Griffin
case and how it applied to the motion, which the trial judge
referred to as a two-page Griffin motion.  (Id. at 2046-47; id.
Rep.'s Tr. vol. 12, 2243.)

Just prior to the jury receiving their instructions, the
parties discussed whether the jury should also be instructed
regarding Petitioner's right to remain silent during court
proceedings.  (Id. Rep.'s Tr. vol. 12, 2243-46.)  The jury was
instructed, prior to a ruling on the mistrial motion:

> A defendant in a criminal proceeding can never be
> compelled to testify.  It is unusual and rare that a
> defendant does testify at a preliminary hearing.  Whether
> a defendant does or does not testify at a preliminary
> hearing has no relevance to any issue in this case and
> may not be considered by you.

(Id. at 2267.)

Immediately after the jury retired for deliberations, the
matter was taken up again.  (Id. at 2340.)  Petitioner's counsel
added the following argument in support of the motion for a
mistrial:

> I believe - - having reviewed the transcript, also, I
> believe that the DA started questioning after Mr. Maxwell
> stated that he had previously talked to his attorney.
>
> His attorney advised him to invoke the Fifth, and
> then he invoked his Fifth Amendment right, refused to
> testify based on his constitutional rights at [the]
> preliminary hearing.
>
> And when the DA starting inquiring into that, that
> is where I believe he stepped beyond the line and started

-43-

10cv1697

questioning about his reasoning for not testifying at a
prelim, and I think that's where he committed the error.

(<u>Id.</u> at 2341.)

The trial judge asked Petitioner's counsel, "So at this point,
your position is that that was <u>Giffin</u> error, and you are also
arguing that that deprived him of a fair trial?"  (<u>Id.</u> at 2343.)
Petitioner's counsel responded:

> I believe it did taint the jury, because, Judge, any
> time you lay the suggestion to a jury, "Why didn't he
> talk before?"  Well, he must have been hiding something.
> So that's probably his reason for not testifying
> previously."  [¶]  Every defendant has a right not to
> testify in a trial.  He also has a Fifth Amendment right
> not to testify or not to speak to law enforcement.  When
> you start questioning about his invoking of his Fifth
> Amendment right, the DA - -
>
> And we are not talking about a new DA or one or two
> years' experience - - I believe, out of all of us, he
> probably has the most number of years as far as
> practicing, so he's not new.  He's got at least 20 years
> as a DA.  [¶]  So we are not talking about somebody
> making a mistake because its his first or second trial.
> This is a clear error, just like the leading questions
> that we have had.
>
> And I am saying at that point he crossed the line.
> He ended up suggesting to a jury: "You had a chance to
> tell your story in the past, you never did, so now you
> are lying or coming up here and trying to tell a lie to
> this jury now," and yet questioning that area, he
> violated [his] Fifth Amendment privilege and his right
> not to testify.

(<u>Id.</u> at 2343-44.)[4]

The trial judge denied the motion for a mistrial, finding no
error.  (<u>Id.</u> Rep.'s Tr. vol. 12, 2344.)  The judge also found that
any error was harmless beyond a reasonable doubt under the totality

---

[4]  Defense counsel's reference to the leading questions referred to
another instance where the trial judge admonished the prosecutor after
sustaining an exacerbated defense counsel's objection to the numerous
leading questions the prosecutor asked Guerrero.  (<u>Id.</u> Rep.'s Tr. vol. 6,
1197-1200.)

of the circumstances, particularly in light of the special jury instruction that the jury was presumed to follow and which cured any taint.  (Id.)

The appellate court analyzed Petitioner's federal claim:

> Here, because Maxwell chose to testify and not to remain silent at trial, his claim of Griffin error is technically inapplicable to his situation.  (Portuondo, supra, 529 U.S. at p. 70; Jenkins, supra, 447 U.S. at p. 238.)  Nonetheless, because the prosecutor's line of questioning Maxwell on cross-examination set forth above attempted to use Maxwell's exercise of his silence to not testify at the preliminary hearing in a similar manner as the use of the defendant's postarrest silence in Doyle, supra, 426 U.S. at p. 618, i.e., to impeach him with the failure to tell someone the story he was now telling the jury, the prosecutor clearly committed Doyle error.  [Footnote:  The People in their respondent's brief assert that Doyle error was not possible based on Maxwell's trial testimony because he stated he never talked to the police at the time of his arrest and they never told him why he was arrested. . . .  No evidence was presented regarding whether or when Maxwell was advised of his Miranda rights.  We cannot presume as the People have that none were given at any point of the process.]  Maxwell's counsel, however, only objected that the prosecutor's line of questioning generally violated Maxwell's constitutional rights and misstated the evidence, both of which were sustained by the court.  When counsel brought his mistrial motion the next court day, he based it solely on Griffin error and did not raise any objection or ask for a mistrial based on Doyle error.  Nor did counsel expand his subsequently filed written motion to include Doyle error.  Under these circumstances, Maxwell has technically forfeited any claim of Doyle error on appeal.  In any event, we find the error harmless in light of this record.
>
> As noted above, the prosecutor's objected-to line of questioning of Maxwell on cross-examination was brief and any impact of the question regarding his not testifying at the preliminary hearing was ameliorated by the court sustaining the objections interposed by defense counsel and it giving the special instruction admonishing the jury not to consider in its deliberations whether Maxwell had testified at a preliminary hearing.
>
> Further, in addition to Maxwell himself initially testifying about talking to an attorney and then invoking his Fifth Amendment right not to talk with the police because of that advisement, there was overwhelming evidence of his guilt.  Despite Maxwell's claim that he did not have knowledge that the others were going to

steal items from Guerrero's home and beat him up,
testimony from Ditmars and Guerrero, as well as Ditmars'
postarrest statement to the police show otherwise.  The
evidence showed that Maxwell, armed with a gun, drove
Ditmars to Guerrero's home, discussing on the way there
what they were going to do to Guerrero and what Ditmars
wanted from the home.  Once there, Maxwell cut some
outside wires and inside telephone lines and then
confronted Guerrero in his bedroom with an assault rifle,
rushed him and tried to hit him with the end of the
rifle.  Maxwell then went through drawers and cabinets
and carried items out of the house.  He was present when
Murphy cautioned Guerrero not to call the police and his
conduct of hiding out and contacting an attorney after
leaving Guerrero's house manifested his consciousness of
guilt.  Under the totality of these circumstances, any
*Doyle* error related to the prosecutor's questioning of
Maxwell about whether he had testified at his preliminary
hearing was harmless beyond a reasonable doubt.
(<u>Chapman</u>, <u>supra</u>, 386 U.S. 18.)

(Lodgment No. 22, <u>People v. Zingsheim</u>, No. D049189, slip op. at 57-
59.)

     Clearly established federal law is that "[t]he Fifth Amendment
prohibits a prosecutor from commenting on a defendant's decision
not to testify."  <u>Rhoades v. Henry</u>, 598 F.3d 495, 510 (9th Cir.
2010)(citing <u>Griffin</u>, 380 U.S. at 615).  In <u>Anderson v. Nelson</u>, 390
U.S. 523 (1968), the "Court announced that *Griffin* error is
reversible error only 'in a case where such comment is extensive,
where an inference of guilt from silence is stressed to the jury as
a basis of conviction, and where there is evidence that could have
supported acquittal.'"  <u>Cook v. Schriro</u>, 538 F.3d 1000, 1021 (9th
Cir. 2008) (quoting <u>Anderson</u>, 390 U.S. at 524).  "Conversely, courts
will not reverse when the prosecutorial comment is a single,
isolated incident, does not stress an inference of guilt from
silence as a basis of conviction, and is followed by curative
instructions."  <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987).
///

The appellate court correctly found there was no <u>Griffin</u> error. Although the prosecutor continued his line of questioning after a first, ambiguous objection was sustained, the questioning was a single, isolated event in a three-week trial. <u>See</u> <u>Lincoln</u>, 807 F.2d at 809. In addition, there was no attempt to stress an inference of guilt from Maxwell's decision not to testify at the preliminary hearing. <u>Id.</u> Rather, the prosecutor was clearly attempting to suggest that Petitioner was tailoring his testimony to the evidence presented by the other witnesses. <u>Id.</u>; <u>see also</u> <u>Portuondo v. Agard</u>, 529 U.S. 61, 64-65 (2000) (holding that prosecutor's comment in summation that the defendant had the opportunity to hear the testimony of all the other witnesses and tailor his testimony accordingly did not constitute <u>Griffin</u> error.) Finally, the curative instruction was specifically tailored to Petitioner's decision not to testify at the preliminary hearing. <u>See</u> <u>Lincoln</u>, 807 F.2d at 809. Accordingly, to the extent Petitioner contends he is entitled to federal habeas relief based on <u>Griffin</u> error, the appellate court's determination that there was no <u>Griffin</u> error was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts. <u>Harrington</u>, 562 U.S. at ___, 131 S. Ct. at 786-87; <u>Miller-El</u>, 537 U.S. at 340; <u>Williams</u>, 529 U.S. at 412-13; <u>Portuondo</u>, 529 U.S. at 65-74; <u>Anderson</u>, 390 U.S. at 524; <u>Lincoln</u>, 807 F.2d at 809.

Clearly established federal law also provides that the use for impeachment purposes of a defendant's post-arrest silence, after <u>Miranda</u> warnings, violates the Due Process Clause of the Fourteenth Amendment. <u>Doyle</u>, 426 U.S. at 619. The state appellate court

found <u>Doyle</u> error arising from the prosecutor's attempt to impeach Petitioner "with the failure to tell someone the story he was now telling the jury, . . . ." (Lodgment No. 22, <u>People v. Zingsheim</u>, No. D049189, slip op. at 58.) Respondent does not challenge the finding of <u>Doyle</u> error. (Answer Attach. #1 Mem. P. & A. 21-32, ECF No. 7.) Instead, he argues that the appellate court was correct in finding no prejudice arising from the error and that any error was harmless. (<u>Id.</u> at 21-32.)

    <u>Griffin</u> and <u>Doyle</u> errors are both subject to harmless error analysis. <u>Chapman v. California</u>, 386 U.S. 18, 22 (1983) (<u>Griffin</u> error); <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 622 (1993) (<u>Doyle</u> error). In <u>Fry v. Pliler</u>, 551 U.S. 112 (2007), the Court held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in <u>Brecht</u>, whether or not the state appellate court recognized the error and reviewed it for harmlessness under . . . <u>Chapman</u>." <u>Id.</u> at 121-22 (citations omitted). For trial error, <u>Brecht</u> provides for habeas relief where "the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict[,]' or . . . the judge 'is in grave doubt' about the harmlessness of the error." <u>Medina v. Hornung</u>, 386 F.3d 872, 877 (9th Cir. 2004) (alteration in original) (citations omitted).

    Maxwell contends the curative instruction focused only generally on his failure to testify at the preliminary hearing and did not address the prosecutor's implication that Petitioner failed to articulate his defense to the police or at any prior court proceeding. (Traverse Attach. #1 Mem. P. & A. 6-7, ECF 11.)

Petitioner also disputes Respondent's contention that there was overwhelming evidence of his guilt. (_Id._ at 7.) Rather, he argues that he was never found in possession of any stolen items, and he provided a plausible, innocent reason for being at Guerrero's residence. (_Id._) Maxwell contends the evidence against him was primarily based on the testimony of Ditmars and Guerrero, both of whom had credibility problems. (_Id._)

A grave doubt does not exist as to whether the prosecutor's questions regarding Petitioner's decision to remain silent during police interrogation and at the preliminary hearing had a substantial or injurious effect or influence on the jury's verdict. As the appellate court pointed out, evidence was presented by Ditmars and Guerrero, at trial and through Ditmars's prior statements, that Maxwell took items from the house, cut the alarm wires, and was armed during the robbery. Petitioner's stated reason for going to Guerrero's house, to make sure Ditmars could retrieve her identification safely so as to be able to go to the hospital, was contradicted by Ditmars, who said she did not leave any personal belongings behind. Maxwell's testimony that he was not armed during the robbery was contradicted by Guerrero. Although Petitioner's neighbor testified that Maxwell's Toyota was empty a few minutes after the robbery, that witness was impeached with his three felony convictions and his friendly relationship with Petitioner.

Maxwell is certainly correct that Guerrero and Ditmars had credibility problems. They both admitted to smoking methamphetamine around the time of the robbery and having lied to the police. (Lodgment No. 4, Rep.'s Tr. vol. 1, 155; _id._ Rep.'s

Tr. vol. 2, 364; id. Rep.'s Tr. vol. 7, 1307, 1390-91.)  Guerrero admitted he lied to the jury, and admitted he testified untruthfully at the preliminary hearing.  (Id. Rep.'s Tr. vol. 6, 1209-12, 1270-71; id. Rep.'s Tr. vol. 7, 1393-96.)  Ditmars repeatedly was unable to remember the events until confronted with her statements to the police.  She testified that she was not sure whether she had lied during her testimony.  (Id. Rep.'s Tr. vol. 3, 462-63.)  And of course, Ditmars and Guerrero gave different accounts of whether their sex was consensual.

Nevertheless, Petitioner evinced a consciousness of guilt by hiding out when the police were looking for him after his home had been searched and his car impounded.  The explanation he offered during his direct testimony was that he delayed turning himself in because he first wanted to consult a lawyer since he was on probation.  Thus, his testimony regarding the advice he received from counsel served his defense by explaining why an innocent bystander caught in a robbery perpetrated by Ditmars and Zingsheim did not immediately go to the police.  It was Petitioner who first placed this information before the jury.  The prosecutor's questioning did not touch on an area Maxwell had not already brought to the jury's attention.  In addition, Maxwell and a police officer both testified that Petitioner did not follow his attorney's advice to remain silent upon his arrest; Petitioner spoke to the police shortly after being taken into custody.

The prosecutor should not have attempted to use Petitioner's decision to follow his lawyer's advice to remain silent against him at trial, Doyle, 426 U.S. at 619, but was permitted to point out ///

1  this inconsistency in Petitioner's testimony, <u>Portuondo</u>, 529 U.S.

2  at 73.

3      A witness's ability to hear prior testimony and to tailor
       his account accordingly, and the threat that ability
4      presents to the integrity of the trial, are no different
       when it is the defendant doing the listening.  Allowing
5      comment upon the fact that a defendant's presence in the
       courtroom provides him a unique opportunity to tailor his
6      testimony is appropriate – and indeed, given the
       inability to sequester the defendant, sometimes essential
7      – to the central function of the trial, which is to
       discover the truth.

8

9  <u>Portuondo</u>, 529 U.S. at 73.  In any case, the prosecutor's line of

10 questioning in this area was brief, and the objections to it were

11 sustained, reducing the possibility the jury drew an impermissible

12 <u>Doyle</u> inference.

13     Furthermore, Maxwell's statement to the police that he was

14 just trying to help a girl get away from an estranged boyfriend

15 diminished any potential the jury would draw an improper inference

16 that his silence was a result of guilt, and increased the

17 likelihood the jury drew a proper inference that Petitioner was

18 waiting for all the evidence to come in before tailoring his story

19 to the evidence presented at trial.

20     Petitioner is asking the Court to make an independent

21 determination of the state court's finding that the error was

22 harmless.  (Pet. Mem. P. & A. 24-25, ECF No. 1.)  The jury was

23 instructed that it was unusual for a defendant to testify at a

24 preliminary hearing, and the decision whether to do so was

25 irrelevant to any issue in the case and could not be considered.

26 Fair-minded jurists can disagree that any taint arising from the

27 prosecutor's questions was slight and was diminished further by the

28 instruction.  <u>See</u> <u>Francis v. Franklin</u>, 471 U.S. 307, 324 n.9 (1985)

("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.")  In this case, however, the Court concurs with the state court that any Doyle error was harmless.

The adjudication of this aspect of claim one by the state appellate court was neither contrary to, nor involved an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Fry, 551 U.S. at 121-22; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412-13; Portuondo, 529 U.S. at 65-74.

                    c.   Questioning of Ditmars

Petitioner next contends the prosecutor committed misconduct when he asked Ditmars unfounded questions regarding her fear of retaliation from Maxwell, and asked her if she was looking at Petitioner during her testimony.  (Pet. 6, ECF No. 1; id. Mem. P. & A. 25-28.)  Cate responds that the appellate court's denial of this aspect of claim one was objectively reasonable, as the record reflects that the prosecutor did not suggest any improper inferences and was merely seeking to elicit relevant and admissible evidence.  (Answer Attach. #1 Mem. P. & A. 36-37, ECF No. 7.) Respondent also contends any error was clearly harmless.  (Id. at 37.)

The prosecutor questioned Ditmars on redirect:

    Q.   This, did you ever look over at Mr. Maxwell
         while your were testifying?

1    [Petitioner's counsel]:  Objection.  Relevance.

2    The court:  Overruled.

3    A.    Yes.

4    [Prosecutor]:

5    Q.    And why were you looking at Mr. Maxwell?

6    [Petitioner's counsel]:  Again, relevance.

7    The court:  Overruled.

8    A.    Because I can.

9    [Prosecutor]:

10   Q.    Did you attempt to mouth a word to him?

11   A.    No, I didn't.

12   Q.    Now, you don't want to be a snitch; right?

13   A.    Of course I don't.

14   Q.    You don't want to have a snitch jacket; right?

15   A.    Of course I don't.

16   Q.    It's important for you to know that these three
         defendants don't think you are here testifying
17       on your own accord; right?

18   [Petitioner's counsel]:  Objection.  Calls for
         speculation.  [¶]  Argumentative.
19
     The court:  Sustained.
20
     [Prosecutor]:
21
     Q.    Ma'am, are you afraid that if these three guys
22       determine that your [sic] testifying
         voluntarily, that you can be in a lot of
23       trouble?

24   [Petitioner's counsel]:  Objection.  Relevance.

25   The court:  Overruled.

26   [Zingsheim's counsel]:  Objection.  Vague as to what he
         means by "a lot of trouble."  It assumes there is
27       somehow a threat to her, which is not in evidence.

28   The court:  Sustained.

[Prosecutor]:

Q.   You believe if these guys think that you are
     testifying voluntarily, you would be in some
     danger?

[Petitioner's counsel]:  Objection.  Calls for speculation
     on "these three guys."

[Prosecutor]:  Her belief as it affects her testimony.

[Murphy's counsel]:  Compound, Your Honor.

The court:  Sustained as compound.

[Prosecutor]:

Q    Are you afraid that if these three guys find
     out or believe that you are testifying
     voluntarily, that you are in some danger?

[Zingsheim's counsel]:  Your Honor, it the same objection
     I made before.  Improper question.  It's irrelevant,
     immaterial, and frankly is designed to convey some
     intent to the jury.

[Petitioner's counsel]:  It's also argumentative.

[Murphy's counsel]:  And it's compound.

[Prosecutor]:  It's her belief.

The court:  You have to take it as to each individual.

Q.   Are you afraid, if Zingsheim thinks you are up
     here voluntarily, that you would be in some
     danger at some future date?

A.   I am not up here voluntarily.  I had no choice.

Q.   Are you afraid if he thought you were up her
     voluntarily?

A.   I don't know what he thinks.

Q.   You wouldn't want him to think you were up
     there voluntarily; right?

[Petitioner's counsel]:  Objection.  Argumentative.

The court:  Overruled.

[Murphy's counsel]:  Irrelevant, Your Honor.

The court:  Overruled.  [¶]  Ask the question again, please.

[Prosecutor]:

Q.   You wouldn't want Zingsheim to think you were
     up there voluntarily, would you?

A.   No.

Q.   You wouldn't want Maxwell to think that, would
     you?

A.   No.

Q.   And you wouldn't want Murphy to think that,
     would you?

A.   Of course not.

Q.   Why not?

A.   I don't know.  Why would I?

Q.   That's what I'm asking.  Why not?

A.   I don't understand.  If I am already in prison
     doing my thing, why I should have to come down
     here and do this voluntarily?

Q.   Are you afraid there could be some retaliation
     if word got out if you were here voluntarily?

[Zingsheim's counsel]:  Objection.  This is irrelevant
     and highly prejudicial, and if it continues, I am
     going to move for a mistrial.

[Prosecutor]:  It affects her willingness to testify
     truthfully, which I think is pretty clear with all
     the "I don't knows," "I don't remember," and "I lied
     then, I am not lying now."

[Murphy's counsel]:  None of these questions, Your Honor,
     bear on her truthfulness.  None of them do.

(Lodgment No. 4, Rep.'s Tr. vol. 3, 453-56.)

     A sidebar was then held where the prosecutor indicated he was

simply attempting to explore Ditmars's motive for not testifying

truthfully.  (Id. at 457-58.)  Petitioner's counsel argued that the

line of questioning was irrelevant, went beyond exploring Ditmars's

credibility, and implied that the defendants were threatening her.

(Id. at 459-60.)  The prosecutor explained that the jury should be

-55-                                              10cv1697

provided with an alternative explanation as to why Ditmars had so much trouble remembering the events aside from her drug use, i.e., she was afraid of testifying against the defendants.  (Id. at 460-61.)

The trial judge ruled that the prosecutor could ask Ditmars if she was afraid of getting a "snitch jacket," provided he laid the foundation by asking if she had lied during her testimony.  (Id. at 460-62.)  Ditmars then testified that she did not know if she had lied to the jury, but acknowledged she was concerned about getting a "snitch jacket."  (Id. at 462-63.)  After covering other topics, the prosecutor returned to whether Ditmars was looking at Maxwell during her testimony:

> Q.  Did you tell Maxwell you were going to steal stuff?
>
> A.  I don't remember.
>
> Q.  You remembered yesterday, right, or was that just the transcript?
>
> [Zingsheim's counsel]:  Objection.  Argumentative.
>
> [Petitioner's counsel]:  Objection.  Argumentative.
>
> The court:  Overruled.
>
> [Prosecutor]:
>
> Q.  I am asking which one it was.  You keep looking over there.  [¶]  What do you keep - -
>
> A.  I can look wherever I want.
>
> Q.  You are looking at Maxwell.  [¶]  Is there a reason?
>
> A.  I can't even see him from sitting right here.
>
> [Murphy's counsel]:  Your Honor, I think the record should reflect that often she is looking at me.
>
> The court:  I have no way of knowing who she is looking at.

[Petitioner's counsel]:  If the record may reflect, the court reporter is sitting directly in the line of sight, plus from that angle I think the court's bench is also covering her line of sight over to Mr. Zingsheim and Mr. Maxwell.

[Zingsheim's counsel]:  And, Your Honor, my objection - - that's not a question.  And the jury is charged with the duty of watching the demeanor of a witness.  [¶]  It's not for the prosecutor to comment on.  It's for the jury to make interpretations based on what they are seeing.

The court:  Mr. Przytulski [the prosecutor], move on.

(Id. at 481-82.)

The state appellate court denied this claim:

Maxwell's counsel did not make a specific objection on the ground of prosecutorial misconduct to either of the questions asking Ditmars about looking at Maxwell, nor did he or the other defendants ask for any admonishment to the jury about the prosecutor's above line of questioning of Ditmars generally about her demeanor and credibility.  Although the defendants are correct that the demeanor and credibility of a witness are solely the province of the jury to determine, as we have noted above, evidence of a witness's fear of testifying, fear of retaliation for testifying, as well as evidence about the witness's demeanor in testifying are relevant and admissible as to the credibility of a witness and do not constitute misconduct even if intentionally elicited by the prosecutor.  (Evid. Code, §§ 210, 351, 780, subd. (a); Sanchez, supra, 58 Cal.App.4th at pp. 1449-1450.)  The defendants' claim of prosecutorial error based on the prosecutor's inquiries as to whether Ditmars was glancing at Maxwell during trial are therefore technically waived and without merit.

(Lodgment No. 22, People v. Zingsheim, No. D049189, slip op. at 38-39.)

Clearly established federal law provides that "[t]o constitute a due process violation, the prosecutorial misconduct must be '"of sufficient significance to result in the denial of the defendant's right to a fair trial."'"  Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985).

10cv1697

The misconduct is reviewed in the context of the entire trial. <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).  "A constitutional violation arising from prosecutorial misconduct does not warrant habeas relief if the error is harmless."  <u>Towery v. Schriro</u>, 641 F.3d 300, 307(9th Cir. 2010) (citing <u>Sandoval v. Calderon</u>, 241 F.3d 765, 778 (9th Cir. 2000).

Petitioner contends the appellate court erred in rejecting this claim with a generalization that questions about a witness's fear of testifying are relevant and admissible. (Pet. Mem. P. & A. 26, ECF No. 1.)  Maxwell argues that there still must be a good-faith basis for the questions, and here there was none. (<u>Id.</u> at 26-27.)  He argues that Ditmars's fear of obtaining a "snitch jacket" in prison for testifying was not the same message the prosecutor attempted to give the jury, that she was specifically afraid of the defendants. (<u>Id.</u> at 28.)

Respondent contends the prosecutor did not imply something he knew to be false or had strong reason to doubt. (Answer Attach. #1 Mem. P. & A. 36, ECF No. 7.)  Rather, Ditmars admitted she looked at Petitioner during her testimony and did not want any of the defendants to think she was testifying voluntarily. (<u>Id.</u>) Respondent argues that her fear of testifying against Maxwell was therefore relevant to her credibility. (<u>Id.</u> at 36-37.)

Maxwell replies that Ditmars's fear of having a snitch jacket in a women's prison, or being labeled a cooperating witness, is not evidence she was specifically afraid of the defendants. (Traverse Attach. #1 Mem. P. & A. 9, ECF No. 11.)  Petitioner argues that evidence that Ditmars feared retaliation from the defendants, so the prosecutor's repeated questions about that subject over a two-

day period amounted to gross misconduct which, solely or in connection with the Doyle error, infected the trial with unfairness. (Id. at 8-10.)

Considering the prosecutor's conduct in the context of the entire trial, as this Court must, it is clear that the questions regarding whether Ditmars was looking at Maxwell during her testimony were not so significant as to affect the fairness of the trial. Ditmars admitted she looked at Maxwell while she was testifying, and answered defiantly about doing so. Moreover, defense counsel interposed a speaking objection that it was for the jury alone to determine the demeanor of a witness and make interpretations of what the witness is looking at; the objection was immediately followed by a curt direction from the trial judge for the prosecutor to "move on." (Lodgment No. 4, Rep.'s Tr. vol. 3, 482.) The jury was later given instructions consistent with defense counsel's remark:

> You alone must judge the credibility or believeability of the witnesses. . . . [¶] In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors you may consider are: [¶] . . . What was the witness's behavior while testifying. [¶] . . . What was the witness's attitude about the case or about testifying?

(Id. Rep.'s Tr. vol. 12, 2256-57.)

Thus, Ditmars admitted looking at Maxwell, answered defiantly about doing so, and stated that she did not want to be a "snitch." This testimony was a sufficient foundation for the prosecutor's questions. Furthermore, the jury was instructed that they were the judges of credibility and that witnesses' demeanor and behavior were appropriate considerations. The prosecutor brought a relevant

1  factor to the jury's attention; his questioning of Ditmars
2  regarding whether she was glancing at Maxwell during her testimony
3  did not amount to misconduct.  Even if characterized as
4  prosecutorial misconduct, the state court reasonably concluded that
5  it was not "of sufficient significance to result in the denial of
6  the defendant's right to a fair trial."  Greer, 483 U.S. at 765.

7      Petitioner also contends the prosecutor committed misconduct
8  when he asked Ditmars whether she feared retaliation from Maxwell.
9  (Pet. Mem. P. & A. 25-28, ECF No. 1.)  As set forth above, Ditmars
10  never answered directly whether she was afraid that the defendants
11  might think she was testifying voluntarily.  Rather, she testified
12  that she did not want the defendants to think she was testifying
13  against them voluntarily, and she did not want to be a snitch or
14  get a snitch jacket.  The trial was not rendered unfair by the
15  prosecutor's attempt to have the jury draw an inference from that
16  testimony that Ditmars was afraid of testifying against Maxwell.
17  The prosecutor's questions to the witness about whether she was
18  afraid of testifying against Petitioner, in context, even if
19  improper, were not of such significance as to deny him a fair
20  trial.

21      This conclusion is particularly evident in light of the strong
22  evidence of Petitioner's guilt other than Ditmars's testimony,
23  including Guerrero's testimony, which was cumulative to Ditmars's
24  testimony in nearly every important aspect.  This alleged instance
25  of misconduct did not, either by itself or in connection with any
26  Doyle error, render the trial unfair.  Habeas relief is not
27  available with respect to this aspect of claim one because it is
28  not possible that "fairminded jurists could disagree that" the

state court's decision conflicts with United States Supreme Court
precedent.  Harrington, 562 U.S. at ___, 131 S. Ct. at 786.
Furthermore, for the same reasons, any error was clearly harmless.
Fry, 551 U.S. at 121-22; Medina, 386 F.3d at 877.

Accordingly, the Court finds that the appellate court's
determination that Petitioner was not deprived of a fair trial by
the prosecutor's questioning of Ditmars regarding whether she was
looking at him or was afraid of retaliation from him was neither
contrary to, nor involved an unreasonable application of, clearly
established federal law and was not based on an unreasonable
determination of the facts.  Harrington, 562 U.S. at ___, 131 S.
Ct. at 786; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412-
13; Greer, 483 U.S. at 765.  The Court also finds that any error
was clearly harmless.  Fry, 551 U.S. at 121-22; Medina, 386 F.3d at
877.

### d.   Photograph of Rifle

Petitioner next contends the prosecutor committed misconduct
when he questioned Maxwell about a photograph of a rifle which had
been excluded from evidence in a pretrial ruling.  (Pet. 6, ECF No.
1; id. Mem. P. & A. 28-29.)  Respondent argues that the question
did not infect the trial because the photograph was never admitted
into evidence, an objection to the prosecutor's question was
sustained, the question was never answered, and the court
instructed the jury that questions are not evidence.  (Answer
Attach. #1 Mem. P. & A. 41, ECF No. 7.)  Respondent also argues
that even if a due process violation occurred, it was harmless due
to the overwhelming evidence of Petitioner's guilt.  (Id.)
///

1    Ditmars testified that Maxwell had "a long gun," as
2  distinguished from a handgun, with him in his garage, and he had it
3  underneath a jacket when they left to go to Guerrero's house.
4  (Lodgment No. 4, Rep.'s Tr. vol. 1, 113; id. Rep.'s Tr. vol. 2,
5  250-51.)  Guerrero testified that Petitioner was armed with a rifle
6  during the robbery.  (Id. Rep.'s Tr. vol. 5, 1033-34.)  On direct
7  examination, Maxwell denied ever owning an assault weapon or
8  semiautomatic rifle.  (Id. Rep.'s Tr. vol. 8, 1505.)  He testified
9  that a friend of his named Sierra asked him to help sell a rifle
10  once; he denied ever having possession of that gun and said he only
11  saw it when it was in the trunk of Sierra's car.  (Id. at 1505-09.)
12  Maxwell did not find a buyer but described it in detail to Valdez
13  and Guerrero.  (Id. at 1507-08.)

14    A photograph of an assault rifle was provided to the police by
15  Maxwell's mother and was the subject of a motion in limine.  (Id.
16  Rep.'s Tr. vol. 1, 5-6.)  The photograph was excluded for lack of
17  foundation and because Guerrero had described the rifle used in the
18  robbery as having a clip, and apparently the rifle in the
19  photograph, although similar to the one described by Maxwell, had
20  no clip.  (Id.)

21    When the prosecutor asked Maxwell on cross-examination whether
22  he had ever taken a photograph of the rifle Sierra had asked him to
23  sell, Petitioner's counsel's objection was sustained, and a sidebar
24  was held without the question having been answered.  (Id. Rep.'s
25  Tr. vol. 8, 1585.)  At the sidebar, the prosecutor indicated he was
26  attempting to lay a foundation to determine whether the door had
27  ///
28  ///

1   been opened to reconsider the in limine ruling.  (<u>Id.</u> at 1585-86.)

2   Petitioner's counsel responded:

3        Judge, may I make a comment on here?  I believe
     we've covered this in motions in limine.  There is no
4    mention of photos.  I did not discuss any photographs.

5        If you recall his answer on there, he actually saw
     the gun that he described to Mr. Guerrero, which was in
6    the trunk of Mr. Sierra.  There is no reference at all to
     a photograph.

7
         What good do we have of a judge making an order,
8    giving a ruling on motions in limine, giving a ruling on
     multiple sidebars, if this DA doesn't want to comply with
9    these rulings?

10       Judge, I am getting a dang irritated with this
     because it seems to me, no matter what you do, doesn't
11   matter, because he can do what he wants, and then he'll
     get this idea out to the jury anyways, because then the
12   judge will just say not to do it anymore.

13       You are nothing but giving this information to a
     juror that maybe there is photographs out there, that he
14   has these weapons, and none of that stuff was covered on
     direct.

15

16  (<u>Id.</u> at 1586.)

17       When told by the trial judge that Petitioner's counsel had

18  made a good point, the prosecutor asked if he could show Maxwell

19  the photograph and ask if it depicted the gun his friend had asked

20  him to sell, which he believed would not be a violation of the in

21  limine order.  (<u>Id.</u> at 1587-88.)  The trial judge responded to the

22  prosecutor's inquiry:

23       Well, the court is concerned, number 1, that you
     just blurted this out without seeking an advance ruling
24   by this court, understanding there was the in limine
     ruling and, even before, going in that direction.  It was
25   very clear from your question that you were going into
     that direction.  [¶]  And so I don't want things being
26   put in front of the jury that there were in limine orders
     to exclude.  And, clearly, you were already going in that

27

28  ///

1          direction.  And based on the proffer of the objection, it
2          is sustained.  The in limine ruling will stand.

3    (<u>Id.</u> at 1589.)

4          The prosecutor persisted, indicating that he wanted to show

5    Maxwell the photograph and ask if it was his friend's gun.  (<u>Id.</u> at

6    1589-91.)  The trial judge told the prosecutor, "There will be no

7    further mention of a photo."  (<u>Id.</u> at 1591.)  Undaunted, the

8    prosecutor continued to argue that Maxwell had opened the door by

9    testifying that he had no rifles in his house at the time of the

10   crimes.  (<u>Id.</u> at 1591-93.)  Although the photograph was undated,

11   the prosecutor asked for the opportunity to establish that the

12   background of the photograph depicted the garage of Petitioner's

13   mother's house.  (<u>Id.</u> at 1594-96.)  The trial judge denied the

14   prosecutor's request on the basis that such a line of questioning

15   would be more time-consuming and prejudicial than probative.  (<u>Id.</u>

16   at 1597.)

17        This claim was raised on direct appeal and denied by the

18   appellate court, stating:

19             Although none of the defendants specifically used
20        the words of prosecutorial misconduct when making their
          objections to the prosecutor's question about whether
          Maxwell had taken a photo of the gun he was going to try
21        to sell for his friend, it is clear from the record that
          they were complaining about the prosecutor's conduct in
22        allegedly trying to elicit evidence in violation of an in
          limine ruling.  However, no defense counsel asked that
23        the prosecutor's question to Maxwell be stricken or
          requested any admonition, which could have cured any
24        perceived error in the posing of the question.  Because
          the defendants again cannot show on this record that a
25        request for an admonition would have been futile or would
          not have cured any possible error, this claim of
26        prosecutorial misconduct is also technically waived.
          (<u>Cole</u>, <u>supra</u>, 33 Cal.4th at p. 1202.)  In addition,
27        because the photograph was never admitted and the
          defendants essentially obtained the relief they sought by
28        their objections to the prosecutor's photo question which
          was never answered, and the jury was instructed that

                                    -64-                              10cv1697

1          questions to witnesses are not evidence, it is difficult
2          to perceive any harm from the prosecutor's conduct in
           this regard.

3    (Lodgment No. 22, <u>People v. Zingsheim</u>, No. D049189, slip op. at 35-
4    36.)

5          The appellate court correctly observed that it is difficult to

6    perceive any harm from asking Petitioner if he had ever taken a

7    photograph of the rifle that he described to Valdez and Guerrero

8    and attempted to sell but never possessed.  The question was never

9    answered, and the jury was never informed of the existence of any

10   photographs.  The prosecutor showed a surprising amount of

11   impudence when, after the trial judge admonished him for raising

12   the issue without first addressing the in limine ruling and told

13   him unequivocally that there would be no further mention of a

14   photograph, he persisted in arguing that he might be able to

15   establish that the photograph was relevant and admissible.

16   Nevertheless, the jury was not exposed to that exchange.  Although

17   Maxwell certainly has a legitimate concern that the prosecutor was

18   out of line in asking the question without first seeking

19   clarification of the in limine ruling, the jury was instructed that

20   counsel's questions are not evidence.

21          You must decide what the facts are in this case.
22     You must use only the evidence that was presented in this
       courtroom.  Evidence is the sworn testimony of witnesses,
       the exhibits admitted into evidence, and anything else I
23     told you to consider as evidence.  [¶]  Nothing that the
       attorneys say is evidence.  In their opening statements
24     and closing arguments, the attorneys discuss the case,
       but their remarks are not evidence.  Their questions are
25     not evidence.  Only the witnesses' answers are evidence.
       The attorneys' questions are significant only if they
26     help you to understand the witnesses' answers.  Do not
       assume that something is true just because one of the
27     attorneys asked a question that suggested it was true.

28   (Lodgment No. 4, Rep.'s Tr. vol. 12, 2252.)

-65-

1    Petitioner admits the prosecutor's question was not so

2   prejudicial as to warrant habeas relief on its own. (Traverse

3   Attach. #1 Mem. P. & A. 11-12, ECF No. 11.)  Instead, he argues

4   that this incident of misconduct augments the cumulative prejudice

5   analysis.  (Id.)  Nevertheless, even if the question violated the

6   in limine order and amounted to misconduct, it could not have

7   affected the jury because the question was not answered, the jury

8   was not aware any photographs existed, and they were instructed

9   that unanswered questions were insignificant.  In addition, any

10   possible taint could not measurably contribute to cumulative

11   prejudice from the other alleged acts of misconduct.  There is no

12   possibility "fairminded jurists could disagree that" the state

13   court decision conflicts with clearly established federal law

14   regarding prosecutorial misconduct claims.  Harrington, 562 U.S. at

15   ___, 131 S. Ct. at 786.

16    The appellate court's determination that the prosecutor's

17   question about a photograph of a rifle did not deprive Petitioner

18   of a fair trial was neither contrary to, nor involved an

19   unreasonable application of, clearly established federal law and

20   was not based on an unreasonable determination of the facts.

21   Harrington, 562 U.S. at ___, 131 S. Ct. at 786; Miller-El, 537 U.S.

22   at 340; Williams, 529 U.S. at 412-13; Greer, 483 U.S. at 765.  The

23   Court also finds that any error was clearly harmless.  Fry, 551

24   U.S. at 121-22; Medina, 386 F.3d at 877.

25                    e.   Closing Argument

26    The final claim of prosecutorial misconduct involves a

27   statement the prosecutor made during closing argument that

28   Petitioner alleges impermissibly presented the prosecutor's

-66-

personal belief in Maxwell's guilt.  (Pet. 6, ECF No. 1; id. Mem.
P. & A. 29-30.)   The prosecutor stated, during his final closing
argument:

> Let me explain to you how the lesser included offenses
> work.  Let me start out with robbery.  Okay?  That's
> another thing.  You know, I think it was [Murphy's
> counsel] got up and said:  Was there even a robbery in
> this case?  [¶]  I didn't do my job right if you don't
> believe, as you sit there, there was robbery in this
> case, okay?

(Lodgment No. 4, Rep.'s Tr. vol. 12, 2233.)

Murphy's counsel's made an immediate objection on the basis of
improper argument, which was sustained.  (Id.)  The prosecutor
immediately stated, "Look, there is a lot of evidence to suggest --
to prove beyond any doubt there was a robbery in this case, all
right?"  (Id.)

Murphy's counsel had previously stated during his closing
argument, "Now, I guess the first question, ladies and gentlemen,
is:  Was there a robbery here at all?"  (Id. Rep.'s Tr. vol. 11,
2155.)  That statement was made after Murphy's counsel had argued
that the most reasonable interpretation of the evidence was that
everyone went to Guerrero's house that morning not to rob him, but
to confront him about having raped Ditmars and possibly to "kick
his ass."  (Id. at 2135-48.)

The appellate court denied this prosecutorial misconduct
claim:

> The defendants assert the prosecutor's comment that
> he "didn't do [his] job right if you don't believe, as
> you sit there, there was a robbery in this case,"
> constituted prejudicial prosecutorial misconduct.  Again,
> even construing the prosecutor's remark as an improper
> personal belief as to the defendants' guilt rather than
> an offhand comment on the state of the evidence, the
> defendants did not request the jury be admonished about

10cv1697

such remarks, which would have cured any harm, and, therefore, the issue is waived on appeal. (Cole, supra, 33 Cal.4th at p. 1201.)

Further, even assuming the defendants had not forfeited this claim of error, they cannot prevail as they have not shown a reasonable likelihood on this record that the jury understood or applied the prosecutor's comments in an improper or erroneous manner (see Frye, supra, 18 Cal.4th at p. 970), and we presume the jury followed the court's instructions, which included the advisement that the attorneys' remarks during closing argument were not evidence. (Jablonski, supra, 37 Cal.4th at p. 834.) Additionally, any perceived error in the prosecutor's brief remark is harmless on this record, which included overwhelming evidence that the defendants planned to steal property from Guerrero before driving to his home in two separate vehicles, disabling his telephone and alarm systems before entering and confronting him with guns, and then taking a large quantity of his property away from his home in the vehicles.

(Lodgment No. 22, People v. Zingsheim, No. D049189, slip op. at 44-45 (alteration in original).)

Respondent Cate argues there was no misconduct because the comment was made in response to a question defense counsel posed to the jury, was simply a comment on the evidence, and did not suggest there was other evidence not disclosed to the jury. (Answer Attach. #1 Mem. P. & A. 44, ECF No. 7.) He contends the jury was properly instructed that comments of counsel were not evidence, and any error was clearly harmless because the evidence against Petitioner was overwhelming. (Id.)

Petitioner replies that the prosecutor's comment, like his question to Petitioner about the existence of a photograph, "may not alone establish prejudice." (Traverse Attach. #1 Mem. P. & A. 12, ECF No. 11.) Rather, he argues that this instance of misconduct, when considered cumulatively with the other acts of misconduct, demonstrates prejudice. (Id.) Maxwell disputes that

it was merely a comment on the evidence, arguing that the prosecutor stated his personal belief in Petitioner's guilt, and disagrees that the evidence against him was overwhelming.  (Id.)

As quoted above, the state court found that the evidence against Petitioner was overwhelming.  Ditmars's and Guerrero's testimony and Ditmars's postarrest statements constituted overwhelming evidence of Petitioner's guilt.  Although Petitioner correctly observes that both Guerrero and Ditmars had credibility problems, that was a matter for the jury to determine.  The state court correctly found there is no indication the jury perceived the remark as anything other than a comment made in direct response to a statement made by defense counsel.

Moreover, even if the prosecutor's statement is viewed as a pronouncement that he personally believed Petitioner was guilty, he immediately corrected himself by stating that he believed there was sufficient evidence in the record to prove beyond a reasonable doubt that a robbery occurred.  In addition, the court instructed the jury, "You must follow the law as I explain it to you, even if you disagree with it.  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  (Lodgment No. 4, Rep.'s Tr. vol. 12, 2249.)  They were further instructed:

> You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom.  Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.  [¶]  Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence.

(Id. at 2252.)

1    Thus, there is no indication in the record that the

2  prosecutor's remark rendered the trial unfair, either by itself or

3  cumulatively with the other instances of misconduct pled by

4  Petitioner.  It is also clear that any error was harmless.  <u>Fry</u>,

5  551 U.S. at 121-22; <u>Medina</u>, 386 F.3d at 877.

6    Accordingly, the Court finds that the appellate court's

7  determination that Petitioner was not deprived of a fair trial by

8  the prosecutor's comment was neither contrary to, nor involved an

9  unreasonable application of, clearly established federal law and

10  was not based on an unreasonable determination of the facts.

11  <u>Harrington</u>, 562 U.S. at ___, 131 S. Ct. at 786; <u>Miller-El</u>, 537 U.S.

12  at 340; <u>Williams</u>, 529 U.S. at 412-13; <u>Greer</u>, 483 U.S. at 765.  The

13  Court also finds that any error arising from misconduct by the

14  prosecutor was clearly harmless.  <u>Fry</u>, 551 U.S. at 121-22; <u>Medina</u>,

15  386 F.3d at 877.

16    In sum, the Court **RECOMMENDS** reaching the merits of claim one

17  without ruling on Respondent's contention that the claim is

18  procedurally defaulted, and **RECOMMENDS** denying habeas relief as to

19  claim one.

20         2.   <u>Claim Two:  Ineffective Assistance of Counsel</u>

21    In claim two, Maxwell alleges that his right to the effective

22  assistance of counsel under the Fifth, Sixth, and Fourteenth

23  Amendments was violated by trial counsel's failure to properly

24  object to the four instances of prosecutorial misconduct alleged in

25  claim one.  (<u>See</u> Pet. 6-7, ECF No. 1; <u>id.</u> Mem. P. & A. 37-38.)  He

26  further alleges that his appellate counsel rendered ineffective

27  assistance by failing to argue on appeal, as an alternative to

28  prosecutorial misconduct, that the forfeiture of those claims

caused by trial counsel's failure to properly object amounted to ineffective assistance. (Pet. 6-7, ECF No. 1.) Petitioner argues that the cumulative impact of the errors identified in the Petition denied him a fair trial. (Id. Mem. P. & A. Supp. Pet. 38-39.)

Respondent answers that the denial of this claim by the state appellate court is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law governing ineffective assistance of counsel claims and was not based on an unreasonable determination of the facts in light of the evidence presented. (See Answer Attach. #1 Mem. P. & A. 45-49, ECF No. 7.)

Petitioner replies that there was no reasonable basis for counsel not to object at trial, and therefore the failure to object showed a lack of professional judgment. (Traverse Attach. #1 Mem. P. & A. 12-13, ECF No. 11.) He contends the failure to object was prejudicial for the same reasons the prosecutorial misconduct was prejudicial, undermining confidence in the outcome of his trial. (Id. at 13.)

Maxwell raised this claim in a petition for review filed in the California Supreme Court. (Lodgment No. 42, Petition for Review, In re Maxwell, No. [S182412].) The petition was denied without a citation of authority or statement of reasoning. (Lodgment No. 43, In re Maxwell, No. S182412, order.) The claim had been presented to the state appellate court in a habeas petition. (Lodgment No. 38, In re Maxwell, No. D057039 (petition).)

The appellate court denied the claim:

> In this petition Maxwell contends "[t]rial counsel failed to properly object to instances of prosecutorial misconduct and appellate counsel did not argue, as an alternative to arguments that the claims were preserved,

1      that these failures to properly object were instances of
2  ineffective assistance of counsel and thus insure review
    on the merits of the claims."  Maxwell points to four
    specific instances of claimed prosecutorial misconduct
3      . . . and cumulative error.  This court addressed each of
    the above claims of prosecutorial misconduct on the
4      merits and found no reversible or cumulative error.
    Maxwell has not shown that had trial counsel raised the
5      proper objection of prosecutorial misconduct at trial, or
    that had appellate counsel raised the claim of
6      ineffective assistance of trial counsel, he would have
    achieved a better result.  (<u>Strickland v. Washington</u>
7      (1984) 466 U.S. 668, 697; <u>In re Jackson</u> (1992) 3 Cal.4th
    578, 604.)

8

9  (Lodgment No. 41, <u>In re Maxwell</u>, No. D057039, order at 1

10  (alterations in original).)

11      The clearly established United States Supreme Court law

12  governing ineffective assistance of counsel claims is set forth in

13  <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  <u>See</u> <u>Baylor v.</u>

14  <u>Estelle</u>, 94 F.3d 1321, 1323 (9th Cir. 1996) ("[<u>Strickland</u>] has long

15  been clearly established federal law determined by the Supreme

16  Court of the United States.").  For ineffective assistance of

17  counsel to provide a basis for habeas relief, Petitioner must

18  demonstrate two things.  First, he must show that counsel's

19  performance was deficient.  <u>Strickland</u>, 466 U.S. at 687.  "This

20  requires showing that counsel made errors so serious that counsel

21  was not functioning as the 'counsel' guaranteed the defendant by

22  the Sixth Amendment."  <u>Id.</u>  Second, he must show counsel's

23  deficient performance prejudiced the defense.  <u>Id.</u>  This requires

24  showing that counsel's errors were so serious they deprived

25  Petitioner "of a fair trial, a trial whose result is reliable."

26  <u>Id.</u>

27      To satisfy the prejudice prong, Petitioner must demonstrate a

28  reasonable probability that the result of the proceeding would have

1  been different absent the error.  <u>Williams</u>, 529 U.S. at 406;

2  <u>Strickland</u>, 466 U.S. at 694 ("The result of a proceeding can be

3  rendered unreliable, and hence the proceeding itself unfair, even

4  if the errors of counsel cannot be shown by a preponderance of the

5  evidence to have determined the outcome.")  The prejudice inquiry

6  is to be considered in light of the strength of the prosecution's

7  case.  <u>Luna v. Cambra</u>, 306 F.3d 954, 966 (9th Cir.), <u>amended</u>, 311

8  F.3d 928 (9th Cir. 2002).

9      "Surmounting <u>Strickland</u>'s high bar is never an easy task."

10 <u>Padilla v. Kentucky</u>, 559 U.S. ___, ___, 130 S. Ct. 1473, 1485

11 (2010).  As relevant here, the Supreme Court has cautioned:

12     An ineffective-assistance claim can function as a way to
       escape rules of waiver and forfeiture and raise issues
13     not presented at trial, and so the <u>Strickland</u> standard
       must be applied with scrupulous care, lest "intrusive
14     post-trial inquiry" threaten the integrity of the very
       adversarial process the right to counsel is meant to
15     serve.

16 <u>Harrington</u>, 562 U.S. at ___, 131 S. Ct. at 788 (quoting <u>Strickland</u>,

17 466 U.S. at 689-90.)  In the context of federal habeas review,

18 "[t]he standards created by <u>Strickland</u> and § 2254(d) are both

19 'highly deferential,' . . . and when the two apply in tandem,

20 review is 'doubly' so."  <u>Harrington</u>, 562 U.S. at ___, 131 S. Ct. at

21 788 (citations omitted).

22              a.   <u>Ineffective Assistance of Trial Counsel</u>

23     Because Maxwell is unable to demonstrate prejudice arising

24 from trial counsel's performance, there is no need to determine

25 whether counsel was deficient in failing to raise the proper

26 objections at trial.  <u>See Strickland</u>, 466 U.S. at 690, 694 (holding

27 that both deficient performance and prejudice must be shown to

28 prevail on an ineffective assistance claim).  Where the petitioner

10cv1697

cannot satisfy the prejudice prong of the <u>Strickland</u> analysis, the court need not address whether counsel's performance was deficient. <u>Id.</u> at 697.

In order to demonstrate prejudice, Maxwell must show a reasonable probability that confidence in the outcome of his trial is undermined by defense counsel's failure to raise the proper objections or request curative instructions. <u>Id.</u> at 694. Petitioner argues that this standard has been met for the same reasons he relied upon in claim one to demonstrate he was prejudiced by the prosecutor's misconduct. (Traverse Attach. #1 Mem. P. & A. 13, ECF No. 11.)

As discussed above in connection to claim one, Maxwell's catalogue of the prosecutor's misconduct, either singularly or cumulatively, did not rise to the level of a due process violation because they did not render the trial unfair. The state court's determination to that effect was objectively reasonable. For the same reasons, and particularly in light of the strength of the prosecution's case, Petitioner cannot demonstrate prejudice from his trial counsel's failure to properly object or request curative instructions. He cannot demonstrate a reasonable probability that confidence in the outcome of his trial is undermined by trial counsel's performance. <u>Williams</u>, 529 U.S. at 406; <u>Strickland</u>, 466 U.S. at 694. The state court's determination to that effect is objectively reasonable. When viewed under the doubly deferential lens required for federal habeas review, there is no possibility "fairminded jurists could disagree that" the state court decision conflicts with clearly established federal law as announced in ///

10cv1697

1   Strickland.  Harrington, 562 U.S. at ___, 131 S. Ct. at 786;

2   Strickland, 466 U.S. at 694.

3        The Court finds that the appellate court's denial of this

4   aspect of claim two was neither contrary to, nor an unreasonable

5   application of, clearly established Supreme Court law.  Harrington,

6   562 U.S. at ___, 131 S. Ct. at 786; Strickland, 466 U.S. at 694.

7                  b.   Ineffective Assistance of Appellate Counsel

8        Petitioner next alleges that his federal constitutional right

9   to the effective assistance of appellate counsel was violated

10  because counsel failed to argue on appeal that Maxwell received

11  ineffective assistance of trial counsel based on the failure to

12  raise the proper objections.  (Pet. 6-7, ECF No. 1.)  Respondent

13  replies that there is no reasonable probability Petitioner would

14  have achieved a more favorable result had appellate counsel raised

15  the ineffective assistance of trial counsel claims.  (Answer

16  Attach. #1 Mem. P. & A. 49, ECF No. 7.)  Respondent observes that

17  failing to raise meritless claims on appeal does not constitute

18  ineffective assistance of appellate counsel.  (Id.)

19       Strickland also sets forth the clearly established United

20  States Supreme Court law governing ineffective assistance of

21  appellate counsel claims.  Smith v. Robbins, 528 U.S. 259, 285

22  (2000).  As discussed above, Maxwell is unable to demonstrate

23  prejudice arising from trial counsel's performance.  Consequently,

24  Petitioner cannot establish deficient performance by appellate

25  counsel for failing to raise claims of ineffective assistance of

26  trial counsel.  The failure to raise meritless or untenable claims

27  on appeal does not constitute ineffective assistance of appellate

28  counsel.  Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir.

1991) ("[T]rial counsel's performance, although not error-free, did
not fall below the <u>Strickland</u> standard.  Thus, petitioner was not
prejudiced by appellate counsel's decision not to raise issues that
had no merit.") (footnote omitted); <u>Gustave v. United States</u>, 627
F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an
attorney appeal issues that are clearly untenable."); <u>see also</u>
<u>Baumann v. United States</u>, 692 F.2d 565, 572 (9th Cir. 1982)
(stating that trial attorney's failure to raise meritless legal
argument does not constitute ineffective assistance).

　　　　Neither is Maxwell able to demonstrate prejudice as a result
of appellate counsel's failure to raise ineffective assistance of
trial counsel.  Petitioner contends that appellate counsel should
have argued that "Imperfectly objected claims [of prosecutorial
misconduct] are always reviewable on the merits in the state courts
on constitutional issues . . . ."  (Pet. 7, ECF No. 1.)
Furthermore, any waiver resulting from the failure to properly
preserve the record was caused by constitutionally ineffective
assistance of trial counsel.  (<u>Id.</u>)  Even so, the prosecutorial
misconduct claims were adjudicated on their merits by the state
courts.  Therefore, Petitioner suffered no prejudice as a result of
appellate counsel's decision not to present an ineffective
assistance of trial counsel claim.  <u>Robbins</u>, 528 U.S. at 285-86
(holding that prejudice in this context requires a petitioner to
"show a reasonable probability that, but for his counsel's [error],
he would have prevailed on his appeal[]") (citing <u>Strickland</u>, 466
U.S. at 694).

　　　　The Court finds that the state appellate court's denial of the
ineffective assistance of counsel aspects of claim two was neither

10cv1697

contrary to, nor an unreasonable application of, clearly

established federal law.  Harrington, 562 U.S. at ___, 131 S. Ct.

at 786; Strickland, 466 U.S. at 694.

c.   Cumulative Error

Petitioner's final claim is that the cumulative impact of the

prosecutorial misconduct and ineffective assistance of counsel

resulted in the denial of a fair trial, particularly in light of

the fact that the prosecution's case rested on the testimony of

Ditmars and Guerrero, two witnesses with serious credibility

problems.  (Pet. Mem. P. & A. 38-39, ECF No. 1.)  Maxwell presented

this claim to the state supreme court in the same petition for

review that included his ineffective assistance of counsel claims.

(Lodgment No. 42, Petition for Review, In re Maxwell, No.

[S182412].)  The petition was denied without a citation of

authority or statement of reasoning.  (Lodgment No. 43, In re

Maxwell, No. S182412, order.)  The claim was also presented to the

state appellate court in the third habeas petition Maxwell filed in

that court.  (Lodgment No. 38, In re Maxwell, No. D057039

(petition).)  The appellate court indicated that it had previously

determined that the four instances of prosecutorial misconduct did

not cumulate to prejudice Petitioner, but the prior order did not

address the impact of the instances of ineffective assistance of

counsel.[5]  (Lodgment No. 41, In re Maxwell, No. D057039, order.)

Petitioner also presented the claim to the trial court in a

habeas petition.  (Lodgment No. 34, In re Maxwell, No. HSC11113

---

[5]  Petitioner initially presented his cumulative error claim to the
appellate court in his second habeas petition filed in that court.
(Lodgment No. 30, In re Maxwell, No. D055492 (petition) at 22.)  That
petition was denied without prejudice to present the claim to the trial
court.  (Lodgment No. 33, In re Maxwell, No. D055492 (order.)

10cv1697

(petition) at 18-19.)  The trial court addressed the merits of the claim and denied the petition.  (Lodgment No. 37, <u>In re Maxwell</u>, No. HSC11113, order.)  The Court will look through the silent denials by the state supreme and appellate courts to the last reasoned decision on this claim, the trial court's order.  <u>Ylst</u>, 501 U.S. at 804.  The trial court denied the claim:

> The court has already found the Petition failed to make a prima facie showing that either trial or appellate defense counsel provided ineffective assistance of counsel regarding each of the aforementioned individual claims discussed infra.  The court now finds that the Petition fails to make a prima facie showing for relief based upon the combined or cumulative effect of any prosecutorial misconduct, or that Petitioner was otherwise denied due process or a fair trial.  (<u>People v. Hill</u> (1998) 17 Cal.4th 800, 845; <u>People v. Kronemyer</u> (1987) 189 Cal.App.3d 314, 349.)

(Lodgment No. 37, <u>In re Maxwell</u>, No. HSC11113, order at 20.)

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007) (citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 298, 302-03 (1973).)  Where "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." <u>Id.</u> (quoting <u>United States v. Wallace</u>, 848 F.2d 1464, 1476 (9th Cir. 1988).)  "[W]here the government's case is weak, a ///

1  defendant is more likely to be prejudiced by the effect of

2  cumulative errors."  Frederick, id.

3      Here, the government's case was not as weak as Maxwell

4  suggests.  Two eyewitnesses testified that Petitioner was an armed

5  principal in the Guerrero robbery.  There was other evidence that

6  pointed to Maxwell's guilt.  Petitioner's defense, which was

7  contradicted by Ditmars, was that he went along merely to help

8  Ditmars safely collect her identification and purse so that she

9  could go to the hospital.  Although a review of the trial

10 transcript exposes numerous instances where the prosecutor

11 overstepped the bounds of propriety, Petitioner has not established

12 prejudice, individually or cumulatively, arising from the

13 misconduct or the ineffective assistance of counsel.

14      Even if this Court disagreed with the assessment of the

15 California courts, that is not the test for federal habeas relief.

16 Even if "fairminded jurists could disagree" with the state court

17 decision, Maxwell is not entitled to federal habeas relief.  See

18 Harrington, 562 U.S. at ___, 131 S. Ct. at 786.  The Court finds

19 that the state superior court's denial of this aspect of claim two

20 was neither contrary to, nor an unreasonable application of,

21 clearly established Supreme Court law.  Harrington, 562 U.S. at ___;

22 131 S.Ct. at 786; Williams, 529 U.S. at 412-13; Parle, 505 F.3d at

23 927.

24 **VI.  CONCLUSION AND RECOMMENDATION**

25      The Court submits this Report and Recommendation denying all

26 claims in the Petition to United States District Judge Michael M.

27 Anello under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the

28 United States District Court for the Southern District of

California.  For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the district court issue an order (1) approving and adopting this Report and Recommendation and (2) directing that judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **September 30, 2011**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **October 14, 2011**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

**DATED:** September 8, 2011.

Ruben B. Brooks
**UNITED STATES MAGISTRATE JUDGE**

10cv1697